COMMONWEALTH *vs.* RICARDO M. MIDI.

No. 97-P-1197.

Plymouth. November 10, 1998. - April 2, 1999.

Present: PERRETTA, KASS, & FLANNERY, JJ.[1]

*Arrest. Practice, Criminal,* Property seized at time of arrest, Warrant. *Constitutional Law,* Arrest, Search and seizure. *Search and Seizure,* Arrest, Warrant, Exigent circumstances, Consent.

Police officers' entry into a dwelling to effect an arrest without a warrant was unlawful where there was no exigency [593-594]; and where the officers' discovery of contraband in plain view led to an immediate request for consent to search further, the "consent" obtained could not be deemed "voluntary" or untainted by the prior illegality, and evidence seized thereafter should have been suppressed [594-596].

COMPLAINT received and sworn to in the Brockton Division of the District Court Department on February 28, 1996.

A motion to suppress evidence was heard by *Deborah A. Dunn,* J., and the case was tried before *Rosemary B. Minehan,* J.

*Shannon M. Fitzpatrick* for the defendant.

*Robert C. Thompson,* Assistant District Attorney, for the Commonwealth.

KASS, J. On the basis of a complaint by Carla Andrade that her boyfriend, Darius Pierce, had beaten her up, four police officers went to arrest Pierce at the apartment where he lived. While they roved through the apartment without a search warrant, the police found a firearm owned by the defendant Midi, for which he had no license. Midi was convicted of unlawful possession of a firearm and unlawful possession of ammunition.

[1]This case was argued on November 10, 1998, before Justices Perretta, Kass, and Flannery. Following the death of Justice Flannery, the case was reassigned and Justice Jacobs joined in consideration of the case on the basis of the briefs, the record appendix, and the transcripts.

On appeal, the defendant urges that his motion to suppress evidence of the firearm and ammunition was wrongly denied. We decide that neither exigent circumstances nor consent authorized the warrantless entry and search, and that Midi was entitled to favorable action on his motion to suppress.

1. *Facts.* The sequence of events recounted by police witnesses at the suppression hearing — and as found by the District Court judge who heard and disposed of the motion — is as follows: Officer Margaret Carr of the Brockton police department responded to a domestic violence complaint. She interviewed the mother of the victim and the victim. Following those interviews, Officer Carr led a small detachment of police — four, including herself — to 2 Huntington Place,[2] Brockton, where the batterer, Pierce, was said to live, for the purpose, according to Officer Carr, of arresting Pierce on the domestic violence complaint.[3]

One officer, Gaucher, positioned himself at the rear of the small apartment house at 2 Huntington Street, to guard against anyone hightailing out the back way. Officer Carr, with Officer Mills and Officer Schneider, knocked on the front door, first floor. That elicited no response, but as Carr heard "a lot of scuffling, people running back and forth" on the second floor, she went upstairs to knock there.[4] At first someone inside yelled, "there's no one in here," a manifestly ridiculous message and apparently recognized as such because Darius Pierce himself presently opened the door. The police officers stepped in the apartment and arrested Pierce. The apartment door, according to the judge's findings, "opens into a bedroom" and there Carr saw a few plastic baggies, "believed [by her] to be marijuana,"

---

[2]The testimony of police officers variously describes the place where Pierce lives as 2 Huntington Place, 2 Huntington Street, and 200 Pleasant Street, Brockton. The District Court judge, in his findings on the suppression motion, used 2 Huntington Street and we adopt that. Whatever the correct address is, the police arrived at the right place.

[3]The record does not reveal whether the charge the police had in mind was assault and battery or violation of an abuse prevention order, if one had been issued against Pierce.

[4]At that juncture, Carr describes Officer Gaucher as "at my heels," testimony discordant with where other evidence introduced by the Commonwealth places Gaucher, namely, at the back of the building.

located on the headboard of a bed in the bedroom.[5] Thereupon the police officers began a sweep search of the apartment on the apprehension, expressed by Carr, that where there are drugs, guns are not far behind. Officer Carr converged on the kitchen with other officers, including Gaucher, who said he had been allowed by the "owner" of the apartment, Leslie Thomas, to enter by the rear door. It was at that point, with Pierce under arrest and four police officers, another man (the defendant Midi), another woman, and two children milling around, that Officer Carr asked Thomas for permission to search the rest of the apartment. She told the police officers they could look anywhere they liked because she had nothing to hide.

In the search that followed, the police found a handgun and an ammunition clip on the closet shelf of a second bedroom, from which Midi had been seen emerging. Thomas identified that second bedroom as hers. It is not disputed the weapon and ammunition found in the second bedroom belonged to Midi. His status at the apartment, as described during the suppression hearing, is that he had been staying in the room for several weeks.[6] Whatever Midi's precise status in the apartment, as the evidence seized was an essential element of the crime with which Midi was charged, he had standing to contest the legality of the search leading to the seizure of that evidence. *Commonwealth* v. *Amendola*, 406 Mass. 592, 601 & n.4 (1990). See *Commonwealth* v. *Krisco Corp.*, 421 Mass. 37, 41-42 (1995), which says the question to ask is whether society would accept that a person would have a reasonable expectation of privacy in the space searched. We think society would accept that a room in a residence is a place where an occupant of that room would have an expectation of privacy.

2. *Requirement for an arrest warrant.* It will be recalled that the avowed purpose of the police officers' mission to 2 Huntington Street was to arrest Pierce. They held no warrant so to do. As a baseline principle, police are not free, without a warrant for an arrest, to enter a suspect's home to make a routine

---

[5]The trial judge's findings say Officer Carr also saw five bullets in the same place. That was not Carr's direct testimony, but she did answer, "That's correct," when asked on redirect examination: "And when you took that one step in the apartment is that when you saw the contraband and the bullets?"

[6]During the trial that followed, there was testimony that Midi did not live at 2 Huntington Street, but we, of course, consider the evidence in the state it was left at the conclusion of the hearing on the motion to suppress.

felony arrest. *Payton* v. *New York*, 445 U.S. 573, 588-590 (1980). *Commonwealth* v. *Forde*, 367 Mass. 798, 805-806 (1975). Smith, Criminal Practice and Procedure § 76 (2d ed. 1983 & Supp. 1998). "The right of police officers to enter into a home, for whatever purpose, represents a serious governmental intrusion into one's privacy. It was just this sort of intrusion that the Fourth Amendment was designed to circumscribe by the general requirement of a judicial determination of probable cause." *Commonwealth* v. *Forde, supra* at 805. See *Commonwealth* v. *DiGeronimo*, 38 Mass. App. Ct. 714, 720 (1995), in which we relatively recently rehearsed the law of warrantless entry.

(a) *Exigency exception.* Exigencies, such as danger, the possibility of a suspect's flight, the possibility that evidence may be destroyed, or the prospect that a further crime may be committed, suspend the operation of the basic rule. See *Commonwealth* v. *DiSanto*, 8 Mass. App. Ct. 694, 700 (1979); *Commonwealth* v. *Skea*, 18 Mass. App. Ct. 685, 693 n.12 (1984); *Commonwealth* v. *DiGeronimo, supra* at 722-729 & n.13. The record here is devoid of any evidence that Pierce was considered volatilely dangerous, that he had made any threats, that the victim had expressed fear he might do her imminent harm, that another crime might be committed, or that evidence might disappear. None of the witnesses at the suppression hearing mentioned any urgency about taking Pierce into custody that would have made pausing to obtain an arrest warrant impracticable. Nor was this a case in which the true identity of the suspect was not known until the moment of arrest. Contrast *Commonwealth* v. *Boswell*, 374 Mass. 263, 270 (1978). Rather, the requirement of an arrest warrant to make a routine arrest in a suspect's home seems simply not to have been taken into account.

(b) *Consent exception.* The Commonwealth urges that the seizure of Midi's gun and ammunition was nevertheless made lawful by the consent that Leslie Thomas, the "owner" of the apartment, gave to a general police search of the place. There is support in the record for Thomas having sufficient connection with the room in which Midi lived to have the right to consent to its search. For the sake of analysis, we are prepared to assume that Thomas was not under coercion when she told the police they might look around, although in the confused circumstances, with Thomas surrounded by police who had just

made one arrest, one might view skeptically whether Thomas's acquiescence in further search was an act of free will. See *Wong Sun* v. *United States*, 371 U.S. 471, 486 (1963); *United States* v. *Perez-Esparza*, 609 F.2d 1284, 1288-1291 (9th Cir. 1979); *Commonwealth* v. *Collini*, 264 Pa. Super. 36, 46-48 (1979).

Here, a related, though slightly different, basis arises out of the sequence of events for questioning the lawfulness of the second search, i.e., the one that turned up Midi's gun. An unlawful first search had already been conducted, namely the look around the room into which Officer Carr had stepped without a warrant, before Thomas gave her permission to search the apartment. It was Officer Carr's discovery of marijuana and bullets in the unlawful first search that stimulated her and her team to ask of Thomas that they might look around further.

When consent to search is obtained through exploitation of a prior illegality, particularly very close in time following the prior illegality, the consent has not been regarded as freely given. Evidence gathered in a search allowed by such a compromised consent has been thought to be tainted and inadmissible. See *Brown* v. *Illinois*, 422 U.S. 590, 599-604 (1975); *Commonwealth* v. *Loughlin*, 385 Mass. 60, 63 & n.4 (1982); *Commonwealth* v. *Ellsworth*, 41 Mass. App. Ct. 554, 557 (1996). See also *United States* v. *Wilson*, 569 F.2d 392, 396 (5th Cir. 1978); *United States* v. *Perez-Esparza*, 609 F.2d at 1291; *State* v. *Wrightson*, 391 A.2d 227, 229 (Del. Super. Ct. 1978); *State* v. *Weber*, 116 Idaho 449, 453 (1989); *State* v. *Mitchell*, 360 So. 2d 189, 191 (La. 1978); *Commonwealth* v. *Collini*, 264 Pa. Super. at 46-48; 3 LaFave, Search and Seizure § 8.2(d) (3d ed. 1996).

Here, Thomas gave consent to a further search only minutes after the illegal entry and arrest, upon a request made to exploit the product of that illegality. The connection between a prior illegality and a subsequent search can be attenuated by, e.g., lapse in time, intervening circumstances, and disconnection between the prior illegality and the person giving consent to search. By such attenuation, the consent is cleansed of the taint of the prior illegality. See, notably, *Brown* v. *Illinois, supra* at 603-604; *Commonwealth* v. *Loughlin, supra* at 63-64; *Commonwealth* v. *Ellsworth, supra* at 557. It is the burden of the government to prove that the taint was attenuated enough to allow admission of the evidence derived from prior illegality. *United States* v. *Perez-Esparza, supra* at 1290. We attach no

consequence to Thomas having allowed Officer Gaucher in by the back door. By the time Gaucher arrived on the scene upstairs, Officer Carr had already made her entry and it was she who was asking for a look within other rooms.

We think, in the circumstances of this case, in which there was immediacy between the prior illegality and its exploitation through request for further search, that the consent, in legal context, was not voluntary and that evidence of the firearm and ammunition clip found in Midi's room should have been suppressed.

The government's argument that the firearm and ammunition clip would inevitably have been discovered, see the discussion in *Commonwealth* v. *Benoit*, 382 Mass. 210, 217 (1981), does not add up. Had the illegal entry and attendant observations not occurred, there is no reason to suppose the unlawful objects would have been found.

Police officers, to be sure, are not required to be blind. If, however, they undertake to enter a home to make a routine arrest without obtaining authority in the form of an arrest warrant, they run the risk that they blind themselves. It was error to deny the motion to suppress.

*Judgments reversed.*

*Verdicts set aside.*