COMMONWEALTH *vs.* YEHUDI Y., a juvenile.[1]

No. 01-P-800.

Norfolk. May 20, 2002. - December 20, 2002.

Present: CYPHER, MASON, & COHEN, JJ.

*Controlled Substances. Juvenile Court,* Delinquent child. *Practice, Criminal,* Juvenile delinquency proceeding. *Search and Seizure,* Consent, Expectation of privacy.

Although an undercover police officer's warrantless entry into a home to purchase marijuana from a juvenile was lawful, a second warrantless entry by a uniformed police officer was not; where the second warrantless entry was not justified either by exigency or by the consent of the juvenile's parents, who consented to a search of their home only minutes after the uniformed police officer had entered their living area from another area inside the home, evidence seized as a result of the search should have been suppressed at the juvenile's criminal trial. [815-819]

COMPLAINT received and sworn to in the Wrentham Division of the District Court Department on December 8, 1998.

Pretrial motions to suppress evidence and for reconsideration were heard by *Mary M. McCallum,* J., and the case was heard by *Daniel B. Winslow,* J.

*Dana Alan Curhan* (*Joseph P. Cataldo* with him) for the juvenile.

*Michael J. Markoff,* Special Assistant District Attorney, for the Commonwealth.

CYPHER, J. After a jury-waived trial on stipulated facts, a judge found the juvenile delinquent on a complaint charging him with possession of marijuana, possession of marijuana with intent to distribute, and possession of alcohol by a person under twenty-one years of age. The juvenile appeals from that judgment, arguing that his motion to suppress evidence seized when

[1]A pseudonym.

his parents consented to a search of his room after the police entered a part of their home without a warrant was wrongly denied.[2] The motion judge had concluded that the parents' consent to search was valid because it was sufficiently attenuated from an improper entry.[3] The juvenile argues that this conclusion was in error and that two important findings of fact by the judge are not supported by the record and are clearly erroneous. We agree with the juvenile and reverse the denial of the motion to suppress.

When reviewing a decision on a motion to suppress, we accept the judge's findings unless they are clearly erroneous, but we conduct a de novo review of the application of constitutional principles to those facts. *Commonwealth* v. *James*, 427 Mass. 312, 314 (1998).

1. *Background.* The motion judge found the following facts.[4] For three months, the police had been conducting surveillance of two juveniles, the juvenile defendant and Carl,[5] believed to be selling marijuana at the local high school and from the juvenile's home. On December 7, 1998, State Trooper Patricia Dziadosz,[6] in an undercover capacity and accompanied by a young male informant, entered the juvenile's home by the following route.

Dziadosz and the informant entered through a back door, up a back staircase to an open door, through the open door, through two hallways, and then around a corner of the hallway to a room where they were met by a young male, later determined to be Carl. Dziadosz purchased marijuana from Carl with two marked twenty dollar bills. At the time of the sale, young people were in the room, and one person was in the bathroom.

---

[2]Although not challenged by the Commonwealth, it does not appear that the juvenile signed the affidavit filed in support of his motion to suppress. See Mass.R.Crim.P. 13(a)(2), 378 Mass. 871 (1979) (affidavit must be signed by the person having "personal knowledge of the factual basis of the motion").

[3]The juvenile moved for reconsideration in light of *Commonwealth* v. *Midi*, 46 Mass. App. Ct. 591 (1999), decided the day after the judge ruled on the juvenile's motion. The judge reconsidered and then again denied the motion.

[4]Where the evidence is uncontradicted and uncontroverted, we supplement our discussion as necessary with additional facts from the hearing on the motion. See *Commonwealth* v. *Hurd*, 51 Mass. App. Ct. 12, 13 (2001).

[5]A pseudonym.

[6]She is also referred to as Patricia Jardis.

After purchasing the marijuana, Dziadosz and the informant left the house. Dziadosz then met Sergeant Scott Heagney, who was in uniform, and described the purchase to him. Dziadosz testified that she made the purchase at around 7 P.M. Heagney ordered some of his officers to the front of the residence and instructed them to knock on the front door while he and Detective Kevin Connolly, traveling the route used by Dziadosz, entered the upstairs of the house. According to Heagney, it was 8:30 P.M. The second floor appeared to be an attic. As he entered the second floor area, Heagney encountered a youth and asked him who lived there. The youth said "[Yehudi] lives here." Heagney asked where, and the youth pointed him toward the interior of the house. Heagney told the youth to come with him, and as they walked down the interior hallway, Heagney detected the odor of marijuana, which became stronger as he approached the end of the hallway.

At the end of the hallway, Heagney saw approximately twelve young people in a rear room. He also saw a small pile of marijuana, full and empty beer cans, a large amount of cash on a coffee table, and two boxes of sandwich bags. Several of the young people started to stuff the cash in their pockets, so Heagney ordered them to "just hold it" and told them not to move. He instructed the officers to watch everyone while he went downstairs to speak with the juvenile's parents.

Heagney went down an interior staircase[7] that led him to the interior of the first floor of the residence. Heagney joined the other officers and spoke with the juvenile's parents. Heagney explained to the parents that the police were in their home because their son had been under investigation for several months for selling drugs and that an undercover officer had just purchased marijuana in the rear upstairs room. Heagney "laid out the whole case" and explained that he intended to apply for a search warrant to search the rear upstairs area. He told them that the application process could take several hours and would be inconvenient for the parents. He explained that they could

---

[7] The judge found that Heagney had left the house and walked around to knock on the front door, but there was no such evidence. In contrast, Heagney testified that he went downstairs into the parents' living area by way of an interior staircase.

instead consent to the search, which would speed up the process, but that they were under no obligation to do so. He also told them that the search, under the warrant, would be limited to the upstairs room where the drug buy had occurred.

At some point during this exchange, the juvenile's mother in effect said, "I can't believe you are in my house," and the juvenile's father in effect said, "[T]hey bought drugs out of the house, we may as well let them search." Then, at 8:40 P.M., the parents verbally consented to the search. Heagney reviewed with them in detail a "consent to search" form and explained to them all of the rights on that form. The parents initialed each section as it was explained, and at 9:09 P.M., they signed the form.

Heagney returned to the juvenile's room and placed all of the young people under arrest. One of the marked bills used by Dziadosz was recovered from the juvenile.

2. *The undercover buy.* The juvenile argues that the undercover trooper's entry into the house to purchase marijuana was improper. We disagree. The record could be clearer, but it appears that the undercover trooper and the informant entered the premises through an unlocked or open back door. It also appears that the teenagers would freely enter and leave the house that way. The ease with which the undercover trooper and the informant entered suggests that this was the manner in which the juvenile and Carl conducted business, and indeed, the informant was accustomed to entering the house in this manner. That Carl conducted business with the undercover trooper suggests that Carl assented to the undercover trooper's entry. See *Commonwealth* v. *Wahlstrom*, 375 Mass. 115, 117-118 (1978) (one with apparent authority may assent). After admitting a potential customer into the premises, even if that potential customer is an undercover officer, a seller of drugs does not have a reasonable expectation of privacy in that portion of the premises where he is selling drugs. Cf. *Commonwealth* v. *Sepulveda*, 406 Mass. 180, 182 (1989) (consensual entry into a residence by an undercover officer posing as a drug purchaser was a permissible ruse).

That Carl or the juvenile did not open the back door and admit the undercover trooper does not, in these limited

circumstances, render the undercover officer's entry into the home constitutionally improper. Compare *Commonwealth* v. *D'Onofrio*, 396 Mass. 711, 715, 717 (1986) (if the public is freely admitted, the defendant does not have a reasonable expectation of privacy). Contrast *Commonwealth* v. *Cadoret*, 388 Mass. 148, 150-152 (1983) (police officer's entry into a private club was unlawful where he was denied admission into the premises by the owner and did not have a warrant). See generally *Katz* v. *United States*, 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection"); *Commonwealth* v. *Pina*, 406 Mass. 540, 545, cert. denied, 498 U.S. 832 (1990) (in assessing whether a person has a reasonable expectation of privacy, one factor that is considered is whether a person has taken normal precautions to protect her privacy).

The foray of Dziadosz in the juvenile's household to buy marijuana was, therefore, lawful. In contrast, the second entry by Heagney and the other officers, also without a warrant, stands on a different footing.

3. *The second entry.* We agree with the motion judge that Heagney's entry into the house was improper. No exigency existed to justify the warrantless entry. See *Commonwealth* v. *Kiser*, 48 Mass. App. Ct. 647, 648-649 (2000) (explaining the law of warrantless entry). See generally Smith, Criminal Practice and Procedure § 262 (2d ed. 1983 & Supp. 2002); Grasso & McEvoy, Suppression Matters Under Massachusetts Law § 14-1 (2001).

4. *Consent exception.* Police may conduct a warrantless search with the free and voluntary consent of a person possessing the ability and apparent authority to consent.[8] See *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 222 (1973); *Commonwealth* v. *Ortiz*, 422 Mass. 64, 70 (1996). Whether consent is free and voluntary

---

[8]Throughout her findings, the judge referred to the consent as intelligent, knowing, and voluntary. This is the standard for a waiver of a constitutional right, not the standard for whether consent was voluntarily given. *Commonwealth* v. *Angivoni*, 383 Mass. 30, 34 n.4 (1981). *Commonwealth* v. *Barnes*, 20 Mass. App. Ct. 748, 753-754 (1985). See *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 229-230 (1973) (consent to search need only be voluntary). In these circumstances, the error inured to the benefit of the defendant.

is to be determined from all of the circumstances. *Commonwealth* v. *Barnes*, 20 Mass. App. Ct. 748, 754 (1985). The Commonwealth has the burden of demonstrating that the consent was "unfettered by coercion, express or implied, and also something more than mere 'acquiescence to a claim of lawful authority.' " *Commonwealth* v. *Voisine*, 414 Mass. 772, 783 (1993), quoting from *Commonwealth* v. *Walker*, 370 Mass. 548, 555, cert. denied, 429 U.S. 943 (1976). Where consent is obtained as a result of the exploitation of a prior illegality that follows close in time, then consent is not considered to be freely given. *Commonwealth* v. *Midi*, 46 Mass. App. Ct. 591, 595 (1999). Nevertheless, sometimes "[t]he connection between a prior illegality and a subsequent search can be attenuated by, e.g., a lapse in time, intervening circumstances, and disconnection between the prior illegality and the person giving consent to search." *Ibid.*

The juvenile argues that the judge relied heavily on her finding that one and one-half hours passed between the improper entry by Heagney and the parents' consent to search and that that finding was clearly erroneous.[9] Our reading of the judge's decision supports the juvenile's position that the perceived lapse of time was a significant factor in the judge's analysis. It is apparent from the record, however, that the second entry (by Heagney and the other officers), which was without a warrant and therefore improper, see section 3, *supra*, occurred just minutes before the police approached the parents and asked for their consent. In fact, the police requested consent *while* improperly inside the home. We conclude that the judge's finding with regard to the passage of time between the relevant entry and the parents' consent was erroneous.

There is another error in the findings that is significant in the

---

[9]It is difficult to determine from the memorandum to which entry the judge is referring. The undercover buy, which occurred approximately one and one-half hours before the parents' consent, was the initial entry, but, as previously discussed, was not improper, and the judge did not conclude otherwise.

To further support his argument, the juvenile argues that the police report shows that Dziadosz's entry occurred at 8:30 P.M. That report was not used by defense counsel at the motion hearing during cross-examination and was not brought to the attention of the judge or otherwise made part of the record. It is not, therefore, properly before us for consideration.

determination of whether the parents' consent was sufficiently attenuated from the illegal entry. Heagney's testimony was the only evidence regarding his entry into the downstairs of the home. He testified that he entered the parents' living area from an interior stairwell and not, as the judge found, from the exterior of the home. There was no evidence to support that finding, see note 7, *supra*. Thus, the parents were faced with the police entering their living area from an area *inside* of their home, while other officers were at the front door. In addition, it is unclear from the record whether Heagney, when he "laid it all out" for the parents, relied only on the information obtained in the undercover buy or also included the observations he made when he was upstairs.

The test for voluntary consent includes a number of recognized factors that encompass the personal characteristics of the person giving the consent, see *Commonwealth* v. *Egan*, 12 Mass. App. Ct. 658, 663 (1981), and the precise circumstances of the case. See, e.g., *Commonwealth* v. *Harmond*, 376 Mass. 557, 561 (1978). Although many of the typical indicia used in assessing whether consent is voluntary are present and would weigh in favor of the Commonwealth[10] (including the fact that the parents were not the target of the search, see *Commonwealth* v. *Midi*, 46 Mass. App. Ct. at 595), the fact that there was no break in the nexus between the illegal entry and the request for consent leads us to conclude that the Commonwealth has not met its burden of establishing that the parents' consent was sufficiently attenuated from the improper entry.[11] See *Commonwealth* v. *Midi, supra* at 595-596. See also *Commonwealth* v. *Loughlin*, 385 Mass. 60, 63 & n.4 (1982);

---

[10]For example, the parents faced the police together. See *Commonwealth* v. *Heath*, 12 Mass. App. Ct. 677, 682 (1981) (whether individual is alone when giving consent is a factor to consider when assessing voluntariness). They were also able to, and did, consult with each other. They knew of their right to refuse permission to search. See *Commonwealth* v. *Sanna*, 424 Mass. 92, 98 n.10 (1997). They were not in custody. See *Commonwealth* v. *Aguiar*, 370 Mass. 490, 497 (1976). The police did not lie to them or trick them. See *Commonwealth* v. *Sanna, supra* at 98. In addition, although it is not required, their consent was in writing. *Commonwealth* v. *Franco*, 419 Mass. 635, 642 (1995).

[11]While not conclusive, we note that the police announced their intention to seek a search warrant. See *Commonwealth* v. *Harmond, supra.*

*Commonwealth* v. *Ellsworth*, 41 Mass. App. Ct. 554, 557 (1996).[12]

*Adjudication of delinquency reversed.*

---

[12]We also note that the mother's comment, "I can't believe you are in my house," underscores the link in her mind between the illegal entry and her consent.