COMMONWEALTH vs. ORLANDO OCASIO, JR.

No. 06-P-1831.

Hampden. January 10, 2008. - February 29, 2008.

Present: GREEN, KATZMANN, & GRAINGER, JJ.

*Firearms. Constitutional Law,* Search and seizure. *Search and Seizure,* Consent. *Resisting Arrest. Practice, Criminal,* Admissions and confessions, Argument by prosecutor.

Police officers' search of the apartment where the criminal defendant was residing, upon consent by a cotenant that was given freely, voluntarily, and intelligently with the knowledge that she was free to refuse to consent to the search, was constitutional, where the defendant, who was at the threshold of the apartment, did not protest or object to the search [307-309]; further, the fact that an officer improperly had earlier entered the apartment to answer a telephone did not taint the later consensual search, where the officer did not exploit his unauthorized presence in the apartment to obtain consent to search; where there was no evidence of coercion, trickery, or deceit; where at least fifteen minutes elapsed after the telephone call before the consent was given; and where the officers informed the cotenant of her right to refuse consent before she signed a consent to search form [309-310].

The evidence at a criminal trial was sufficient to convict the defendant of resisting arrest, where the defendant's yelling as he was being escorted from the building and kicking his feet away from a police cruiser as police officers attempted to place him in it could not be considered postarrest conduct, in that the process of effecting the arrest (assuming that the arrest occurred when the defendant was initially handcuffed) continued at least through the officers' placement of the defendant in the cruiser. [310-311]

At the trial of indictments charging, inter alia, resisting arrest, the judge did not abuse his discretion in admitting in evidence the defendant's statement that he was not going back to jail, where the statement was highly relevant to whether the defendant knew he was being arrested, an essential element of the crime. [311]

At a criminal trial, the prosecutor's closing argument did not create an error resulting in a substantial risk of a miscarriage of justice, despite the possibility that it could have been understood to invite the jury to infer guilt from the defendant's denial of guilt before he had been informed of the reason for his arrest, where there was substantial evidence leading to each of the defendant's convictions, and where the prosecutor's remarks related primarily to a charge of which the jury acquitted the defendant. [311-312]

INDICTMENTS found and returned in the Superior Court Department on June 7, 2005.

A pretrial motion to suppress evidence was heard by *Judd J. Carhart,* J., and the cases were tried before *C. Brian Mc-Donald,* J.

*Brownlow M. Speer,* Committee for Public Counsel Services, for the defendant.

*Marcia B. Julian,* Assistant District Attorney, for the Commonwealth.

GRAINGER, J. The defendant, Orlando Ocasio, Jr., was convicted by a jury in the Superior Court of possession of a firearm without an identification card, G. L. c. 269, § 10(*h*), and of resisting arrest, G. L. c. 268, § 32B. He appeals the denial of his motion to suppress items seized in the apartment of his mother, Elizabeth Santos, and appeals his conviction of resisting arrest, asserting insufficient evidence supporting the charge.

*Background.* We summarize the underlying facts as found by the motion judge, which we supplement with testimony that was "uncontroverted and undisputed and [that] the judge explicitly or implicitly credited." *Commonwealth v. Isaiah I.,* 448 Mass. 334, 337 (2007). On the morning of the defendant's arrest, Miguel Delvalle called the Springfield police department to complain that the defendant had threatened him with a sawed-off shotgun when Delvalle went to the defendant's apartment to collect money the defendant owed him. Officers Starks and Cornejo were dispatched to the reported address. Delvalle, who knew the defendant, directed the officers to the apartment, which was located on the thirty-first floor. The officers and Delvalle went together to the hallway outside the apartment, where they knocked on the door. When the defendant opened the door, Delvalle stated, "That's him." The officers "grabbed" the defendant, who was unarmed, and handcuffed him. As they did so, the apartment door closed. Officer Starks asked the defendant if he had a key to the apartment. The defendant stated that he did not and that no one else was in the apartment.

Another officer, Lieutenant Lynch, arrived at that point. Lieutenant Lynch then summoned a building employee, the director of operations. The employee informed the officers that the defendant did not belong in the apartment, and that the apartment was occupied by a female tenant, who was later iden-

tified as Santos.[1] Lieutenant Lynch asked the employee to attempt to contact the female tenant and request that she telephone or return to her apartment.

In order to ascertain whether there was anyone else present in the apartment who might have access to a weapon that might be used against the officers or others present, the officers asked the employee to open the door to the apartment. After verifying that no one else was in the apartment, the officers returned to the hall, leaving the front door ajar. Shortly after they returned to the hall, the telephone in the apartment rang. Officer Starks answered and the caller identified herself as Santos, the defendant's mother, and confirmed that she lived in the apartment. Officer Starks told her that the defendant "was taken into custody because he was accused of committing a serious crime and that it happened in the doorway of her apartment." He asked her if the defendant "belonged here," and she told him that she allowed her son to stay at the apartment. Officer Starks asked her this question to verify that the defendant was indeed her son and not an intruder.

Within about fifteen minutes, Santos arrived at the apartment building. Lieutenant Lynch spoke with her in the building's management office located on the first floor. Officer Starks was present when Santos signed a consent form that permitted the police to search the apartment without first obtaining a search warrant.[2] According to Officer Starks, Santos signed the consent form without being threatened, coerced, or promised anything. Santos did not appear to have any difficulty understanding the officers, nor did the officers have any problem communicating to her. After Santos gave her consent, the officers reentered the apartment. Although the defendant was handcuffed in the hallway outside the apartment, there is no evidence to suggest that he said anything at that time, either in objection or approval of the search. Officer Starks searched the apartment and, in a bedroom

[1] The employee also determined that in addition to Santos, there may have been two other females authorized to live in the apartment.

[2] The employee also was present when Lieutenant Lynch spoke to Santos and witnessed her signing the consent form. The employee testified that the police did not threaten or coerce Santos, but instead calmly informed her that they wanted to search her apartment because they believed there was a firearm inside.

closet, found a black duffel bag that contained a sawed-off shotgun and one shotgun shell. He also found a handgun beneath the bag.

The additional facts from the trial are recited in the light most favorable to the Commonwealth. See *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979). When the officers told the defendant that they were taking him into custody, the defendant said that he "didn't do it," despite not having been told what crime he was accused of committing. As the officers were escorting the defendant to the elevator in order to leave the building, the defendant began yelling. The defendant said that he "wasn't going back to . . . jail." As the officers attempted to place the defendant in the cruiser, he kept kicking his feet away from the cruiser. Two officers were needed to get the defendant into the cruiser.

The jury acquitted the defendant of possession of a sawed-off shotgun and of assault and battery by means of a dangerous weapon, but convicted him of possession of a firearm (the handgun) and of resisting arrest.[3]

*Discussion.* 1. *The consensual search of the apartment.* a. *Consent from a cotenant.* The motion judge found, with ample support in the record, that Santos's consent to the search of her apartment "was given freely, voluntarily and intelligently with the knowledge that she was free to refuse to consent to the search."[4] The defendant asserts that the consent of one tenant of shared premises was not sufficient to pass constitutional muster under the recent holding in *Georgia* v. *Randolph*, 547 U.S. 103 (2006).[5] We therefore recite the facts deemed dispositive in that decision. *Georgia* v. *Randolph* involved a husband who ob-

---

[3]In a jury-waived hearing, the trial judge found the defendant guilty as to that portion of the indictment charging the defendant, pursuant to G. L. c. 269, § 10G(a), with having been previously convicted of one violent crime. This is not part of the defendant's appeal.

[4]We find unpersuasive the defendant's argument that Santos's consent was tainted due to her telephone conversation with Officer Starks while he was in her apartment. There is no basis in the record to reverse the motion judge's explicit finding that Santos freely, voluntarily, and intelligently gave her consent, totally absent of any coercion, trickery, or deceit by the police.

[5]The motion judge's decision was issued approximately two months before the release of *Georgia* v. *Randolph, supra.* At the suppression hearing, defendant's counsel argued, with prescience, that the *Randolph* decision

jected, and his wife who consented, to a search of the marital residence by police officers. The husband was in the home and asserted his objection unambiguously. *Id.* at 107. A majority of the United States Supreme Court held that the consenting wife's permission was not sufficient for a reasonable search, and that the wife, as a cotenant, could not waive the objector's rights under the Fourth Amendment to the United States Constitution "if a potential defendant with self-interest in objecting is in fact at the door and objects." *Id.* at 121. The decision acknowledges the anomaly of a constitutional right, the existence of which is dependent on the knowledge that it is about to be violated:

> "we have to admit that we are drawing a fine line; if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out.
>
> "This is the line we draw, and we think the formalism is justified. So long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection, there is practical value in the simple clarity of complementary rules, one recognizing the co-tenant's permission when there is no fellow occupant on hand, the other according dispositive weight to the fellow occupant's contrary indication *when he expresses it*" (emphasis added).

*Id.* at 121-122.

The defendant here seeks to portray himself as falling on the protected side of the "fine line" drawn by the Supreme Court. See *id.* at 121. We disagree. While he was clearly at the threshold of the apartment, the record contains no evidence of any protest or objection, despite the fact that not one, but two searches occurred while he stood at the door.[6] He argues on appeal that "his refusal of consent [was] obvious from the facts that he knew the police desired to enter the apartment . . . , but [he]

---

would alter the ability of a cotenant to give consent to a warrantless search.

[6]Indeed, even when Officer Starks asked him if he had a key, the defendant did not refuse consent to enter the apartment, but only stated that he did not have a key and that no one else was in the apartment.

never signified assent to that action." This approach would extend the holding in *Georgia* v. *Randolph* to require active participation by a potential defendant to legitimize the consent granted by a cotenant, an extension directly contradicted by the "fine line," on one side of which a potential objector "not invited to take part in the threshold colloquy, loses out." *Ibid.*[7]

b. *The taint of the illegal entry.* The defendant argues that the officers' reentry into the apartment to answer the telephone was improper.[8] We agree. We nonetheless affirm the motion judge's ultimate denial of the motion to suppress, as we conclude that the evidence seized during the later consensual search was not tainted by the illegal entry. See *Commonwealth* v. *Va Meng Joe*, 425 Mass. 99, 102 (1997) ("An appellate court is free to affirm a ruling on grounds different from those relied on by the motion judge if the correct or preferred basis for affirmance is supported by the record and the findings").

"[W]here the defendant seeks to suppress information obtained after unlawful police conduct, the issue is whether the evidence challenged has been obtained by exploiting the illegality or by means sufficiently distinguishable to dissipate the taint." *Commonwealth* v. *Fredette*, 396 Mass. 455, 458-459 (1985). See *Wong Sun* v. *United States*, 371 U.S. 471, 488 (1963). Several factors guide us in our determination whether a subsequent consensual search is sufficiently attenuated from a prior illegality: "lapse in time, intervening circumstances, and disconnection between the prior illegality and the person giving consent to search." *Commonwealth* v. *Midi*, 46 Mass. App. Ct. 591, 595 (1999). Also relevant is "the purpose and flagrancy of the official misconduct." *Commonwealth* v. *Avellar*, 70 Mass. App. Ct. 608, 617 (2007), quoting from *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 258 (1982). See *Wong Sun* v. *United States*, *supra* at 486-488. It is this last factor that the defendant urges

---

[7]Our references to cotenancy here must be read in the context that the record establishes simply that the defendant was using at least one bedroom in the apartment with the permission of Santos, who was an authorized tenant. As a result of his silence at the time of search, we need not address whether his status would have qualified him for the protection afforded a cotenant in *Georgia* v. *Randolph*, *supra*, if he had in fact objected.

[8]The defendant conceded at oral argument that the initial protective sweep, which did not lead to the discovery of any evidence, was valid.

us to apply, arguing that "[w]hen consent to search is obtained through exploitation of a prior illegality, particularly very close in time following the prior illegality, the consent has not been regarded as freely given." *Commonwealth* v. *Midi, supra.* Here, the officers did not exploit their unauthorized presence in the apartment to obtain consent to search. Unlike in *Commonwealth* v. *Midi,* no illegal observation prompted the request for consent to search. Moreover, as the motion judge properly found, there was "no evidence whatsoever of coercion, trickery or deceit."

We also address the lapse in time and disconnection between the illegality and Santos's consent to search. We note that the officers did not obtain consent during or immediately after the illegal entry. Contrast *Commonwealth* v. *Midi, supra.* Nor did they obtain consent while they were illegally inside the apartment talking with Santos on the telephone. Rather, after the officer spoke to Santos on the telephone, fifteen minutes elapsed before she arrived. Then she spoke with the officers in the management office of the apartment building before finally giving the police her consent to search. The illegal entry and the consent were sufficiently distanced.

Finally, as to the presence of intervening circumstances, the police officers informed Santos of her right to refuse consent before she signed a "Consent to Search" form. See *Commonwealth* v. *Bradshaw, supra* at 258-259 (that defendant received Miranda warning prior to making confession was relevant to dissipation of taint of unlawful arrest). The record supports the motion judge's finding that Santos gave her consent "freely, voluntarily and intelligently with the knowledge that she was free to refuse to consent to the search." The voluntary nature of Santos's consent suggests that it was "sufficiently an act of free will to purge the primary taint of the unlawful invasion." *Wong Sun* v. *United States, supra* at 486. Contrast *Commonwealth* v. *Midi, supra* at 594-595 (one might view skeptically whether consent to search was act of free will where consenting party was surrounded by police who had just made arrest in her home).

2. *Resisting arrest.* The defendant challenges the denial of his motion for a required finding of not guilty as to the resisting arrest charge, arguing that there was insufficient evidence to sup-

port such a charge. Specifically, the defendant argues that he is only alleged to have resisted when being placed in the cruiser, and that this conduct was postarrest and cannot support a resisting arrest conviction. See *Commonwealth* v. *Grandison*, 433 Mass. 135, 144-147 (2001). This argument is unavailing. Assuming the arrest occurred when the defendant was initially handcuffed, the process of "effecting" his arrest continued at least through the officers' placement of him in the cruiser. See G. L. c. 268, § 32B; *Commonwealth* v. *Katykhin*, 59 Mass. App. Ct. 261, 262-263 (2003) (although defendant was "seized" when handcuffed, arrest was not fully "effected" at least until he was placed in cruiser).

3. *Remaining arguments.* The defendant's remaining arguments do not merit reversal. It was properly in the trial judge's discretion to admit the defendant's statement that he "wasn't going back to . . . jail." This statement was highly relevant to whether the defendant knew he was being arrested, an essential element of the crime of resisting arrest. See G. L. c. 268, § 32B; *Commonwealth* v. *Lawson*, 46 Mass. App. Ct. 627, 629-630 (1999) (knowledge as element of resisting arrest requires defendant knew he was preventing arrest by police officers acting under color of their authority).

Finally, while we do not condone the prosecutor's closing argument insofar as it might be understood as inviting the jury to infer guilt from the defendant's denial of guilt before he had been informed of the reason for his arrest, it did not create an error resulting in a substantial risk of a miscarriage of justice.[9] There was substantial evidence leading to each conviction. We also note that the prosecutor's remarks were primarily (if not

---

[9]During closing argument, the prosecutor stated:

"And you remember the officer said we told him we were going to have to take him into custody and he didn't say, 'For what?' He never said for what, what? At that point they are in the hallway and they say, we are going to have to take you into custody because you are accused of a crime. His words weren't, 'For what? What did I do?' I didn't do it. I didn't do it. I didn't do, what? I didn't do what is pointed a sawed-off shotgun at a guy who wanted to collect the money back. A sawed-off shotgun that is in the room along with a .22 revolver under the bag when they move it."

exclusively) related to the sawed-off shotgun possession charge, of which the defendant was ultimately acquitted.

*Judgments affirmed.*