Kaplan, Mitchell H., J.
A Suffolk County grand jury returned an indictment against the defendant, Jaime Erazo, for trafficking in cocaine in excess of 100 grams. The case is before the court on the defendant’s motion to suppress all evidence that was seized from him on January 5, 2010, as well as any statements that he made following the seizure. The defendant contends that this evidence was seized in violation of rights afforded him under the Fourth and Fifth Amendments of the United States Constitution and Articles 12 and 14 of the Massachusetts Declaration of Rights and any statements that he made following the seizure and his arrest were fruits of the poisonous tree. See Wong Sun v. United States, 371 U.S. 471 (1963).
The court convened an evidentiary hearing on the defendant’s motion on October 18, 2010. The Commonwealth presented the testimony of Lieutenant David J. Callahan of the Revere Police Department and Agent Andrew Graham, a Deportation Officer with the United States Department of Homeland Security, Immigration and Customs Enforcement Service (ICE), and fourteen exhibits were received in evidence. The parties requested and were given leave to file post-hearing memoranda. Final arguments of counsel were presented to the court on October 27, 2010. After consideration of the foregoing, the motion is ALLOWED in part and DENIED in part.
FINDINGS OF FACT
In consideration of the testimony presented and the exhibits admitted in evidence, the court makes the following findings of fact.
Officer Graham was a United States Border Patrol Officer for twelve years. He transferred to ICE approximately sixteen months before the events at issue in *562 this motion. He is presently a Deportation Officer charged with the apprehension of fugitive aliens who are the subject of warrants for their removal or deportation from the United States (deportation warrants). Generally, deportation warrants are issued after an immigration judge has entered an order for deportation or removal. Officer Graham has arrested some three hundred individuals pursuant to such warrants. Officer Graham is fluent in Spanish — fluency in Spanish is a job requirement for Border Patrol Officers.
For approximately six months preceding his encounter with the defendant, Officer Graham had been attempting to execute a deportation warrant for William Erazo (William), the defendant’s uncle, but had been unable to locate him. While searching for William, Officer Graham learned that William had a nephew, the defendant, who also was the subject of an active deportation warrant which had issued on February 17, 2004.
Officer Graham assembled a so-called “target folder” for the defendant that contained various information concerning his alien status, criminal history, and other matters. In the course of his investigation of the defendant, Officer Graham discovered that the defendant had two vehicles registered in his name showing an address of 105 Bellingham Street, Revere. Officer Graham drove to that address and observed both vehicles parked outside a multi-unit building in this residential area. Officer Graham decided to arrest the defendant pursuant to the active warrant outstanding against him. His principal reason for apprehending the defendant, however, was to obtain information concerning the whereabouts of William.
Under certain circumstances, Deportation Officers have discretion to release aliens who have deportation orders outstanding against them, subject to orders of supervision, while they await deportation. Officer Graham reviewed the defendant’s target folder and confirmed that the defendant had nothing in his record that would preclude Officer Graham from granting the defendant such a discretionary release, e.g., prior criminal convictions. Officer Graham was, therefore, considering offering the defendant such a discretionary release, if he were arrested, as an inducement for assistance in locating William. Officer Graham was also aware that because the defendant was bom in El Salvador he might be eligible to remain in the United States, notwithstanding the order of deportation, if he met certain criteria, under a program called “temporary protective status.” A review of the target folder disclosed that the defendant was not currently the beneficiary of temporaiy protective status, although he might have once had such a designation.
Officer Graham conducted surveillance of 105 Bel-lingham waiting for the defendant to enter or exit, but did not see him. At 6:00 A.M. on the morning of January 5, 2010, Officer Graham arrived at 105 Bel-lingham in the company of several other immigration officers. They were dressed in civilian clothing, but had badges handing from their necks identifying them as ICE officers. When, by 8:00, they had not observed the defendant, they decided to knock on the door of his apartment. Officer Graham in the company of two or three other officers went to the apartment door, while two or three additional officers stationed themselves near the back door of the building in case the defendant tried to exit that way. Officer Graham knocked on the apartment door and a woman later identified as the defendant’s girlfriend, Rachel Jenks, answered the door.
Officer Graham recalls Ms. Jenks coming to the door dressed as if she had recently got out of bed. He does not specifically remember his initial exchange with Ms. Jenks, but he has a standard colloquy that he uses when he knocks at the door of a residence where he believes the subject of a warrant resides, and he has no memory of any events that suggest that something out of the routine occurred on this occasion.
According to Officer Graham, he would have identified himself and his companions as immigration officers and then said the following: “Good morning, we’re with the police, we’re conducting an investigation, would you mind if we come into your apartment so that we can talk to you? We’re trying to locate a person that we believe was living at this address.” He would not have entered if Ms. Jenks had not consented to their entry.
Once inside, Officer Graham asked Ms. Jenks, “Is there anybody else home in the house?” Officer Graham recalls Ms. Jenks telling him that the defendant was in the bathroom and his asking Ms. Jenks if she would ask him to come out. As he was making that request, he saw the defendant come out of the bathroom in his underwear. He recognized him from the photographs in the target folder.
Officer Graham could see that there was a small child in the apartment and also a puppy, but asked, “[I]s it okay if we look around and make sure there’s nobody else in the house, you know, for our safety?” This is standard operating procedure for Officer Graham and he makes this request in every entry. Ms. Jenks agreed that the apartment could be searched. The apartment was “small” consisting of a living room separated from the kitchen by a half-wall, two bedrooms and a bathroom.
Shortly after the sweep began, another of the officers reported that one of the bedrooms had a locked closet door. One of the officers inquired of Ms. Jenks, “There’s a locked closet in here, can we get in to see if anybody’s in there?” Ms. Jenks agreed and showed the officer where the key to the closet was kept. Ms. Jenks spoke English well, without any foreign accent.
Officer Graham next spoke to the defendant. He spoke to him in English, which the defendant seemed to understand adequately. The defendant did not ap *563 pear agitated or unusually upset. The defendant responded in a broken, but easily understood English. Officer Graham typically also repeats words or phrases in Spanish, if he thinks that he has not been understood. He probably did so in this exchange, but does not specifically remember. Officer Graham confirmed that the defendant was Jaime Erazo, the subject of the warrant. He placed him under arrest, handcuffing his hands behind him.
Officer Graham then asked the defendant if he had a passport. This too was part of Officer Graham’s standard practice, as an alien would have to remain in detention until ICE applied for and obtained travel documents, if the alien did not have a valid passport. The defendant said that he had a passport in the bedroom in the dresser. The defendant was then still in his underwear and by this point all of the immigration officers had entered the apartment. They numbered seven, including Officer Graham.
A few moments later, an officer returned from the bedroom and said that he had not found the passport, but there was a very large bundle of U.S. currency on top of the dresser. Another officer then reported that he had seen a lockbox in the closet that had previously been locked and asked if the passport could be in the lockbox. The defendant responded that his passport was probably not in the lock box but in the dresser in the bedroom, and he did not know what was in the lock box.
Officer Graham then asked the defendant if they could look in the lock box in case the passport was there. The defendant said that they could. Officer Graham asked where the key to the lock box was and the defendant directed them to some keys hanging from a hook and identified the lock box key. When the box was opened three large bundles of cash wrapped in paper towels were revealed-some thirty thousand dollars in currency. The defendant said, “That’s not my cash, it’s Uncle William’s.”
At that point, Officer Graham explained to the defendant that he was looking for Uncle William. He went on to say that he might be able to offer supervised release to the defendant, pending deportation, if the defendant helped him locate William. The defendant said that he knew where William lived but expressed some anxiety that William would find out that the defendant had assisted the immigration officers. Officer Graham told the defendant that they would go to William’s residence in a car with dark tinted windows, William would not be able to see him, and he would not tell William how the officers found him. The defendant agreed to help. He dressed and got into a car with Officer Graham and other officers. The defendant directed Officer Graham to William’s residence, where William was arrested by uniformed officers.
At that point, Officer Graham might well have take the defendant to ICE offices for processing, but by then he had received a call from his supervisor to the effect that there would be further investigations involving the defendant and that he was to return the defendant to 105 Bellingham. When they arrived back at the defendant’s residence, “four or five” additional state and federal officers had arrived, some of whom were not familiar to Officer Graham. They were all in plain clothes. There is no evidence before the court that shows, or even suggests, that any of the officers in 105 Bellingham had the consent of the defendant or Ms. Jenks to be there.
Among the officers in 105 Bellingham was Special Agent Bruce Gauthier of ICE Investigations. Agent Gauthier told Officer Graham that he wanted the defendant to sign a consent to search form. The defendant was still handcuffed (with his hands in front of him) and there were many officers in the small apartment. Officer Graham explained to the defendant that the officers thought that there was cash and contraband in the apartment and wanted to conduct a search. He read the defendant a consent to search form in English and explained it to him in lay person’s terms in Spanish.
The defendant signed the form and a search of the apartment ensued while the defendant sat in the kitchen. The search disclosed two small plastic packets of cocaine and additional cash found in the pockets of clothes hanging in the closet. At that point, the defendant was read his Miranda warnings in Spanish and signed a Spanish language Miranda form. The search continued and another packet of cocaine was found in the pocket of a pool table in the second bedroom.
At some point during this process, Lieutenant Callahan arrived. Lt. Callahan is the officer in charge of the Revere Police drug control unit. He spoke to the defendant in English. The defendant’s English was “broken,” but Lt. Callahan believed that he had no problem communicating with the defendant. Lt. Callahan asked the defendant if there were any more drugs in the apartment. The defendant expressed concern for his girlfriend and his son. To that, Lt. Callahan responded that “if there was additional contraband in the house, [they] were going to locate it; if [the defendant]... led them to where it was concealed ... it might protect his girlfriend from any criminal prosecution or arrest that was possible.” The defendant then directed Lt. Callahan to look in the vanity in the bathroom. When the defendant entered the small bathroom, there was a distinct smell of cocaine. He opened the doors to the vanity and found two plates, scales and a substantial quantity of cocaine.
Lt. Callahan walked the defendant to a police cruiser, which was to transport him for booking. During the walk, the defendant said words to the effect that the cash was work money or some drug and some work money. Also, at some point, the defendant signed a “Disclaimer” form dated 1/05/10, that was witnessed by Officer Graham, and stated that William *564 was the lawful owner of “6 bundles of cash” and the defendant disclaimed any ownership or interest in it. The defendant’s passport was eventually found in one of his vehicles.
RULINGS OF LAW
The Commonwealth argues that the evidence recovered from 105 Bellingham was seized as a result of a series of searches to which the defendant and Ms. Jenks consented. The defendant maintains that his consent, and that of Ms. Jenks, was the product of coercion by law enforcement officials. Therefore, the admissibility of the evidence turns on the question of whether the consent of the defendant and Ms. Jenks was voluntary.
“Whether consent is voluntary is a question of fact to be determined on a case by case basis.” Commonwealth v. Kipp, 57 Mass.App.Ct. 629, 635 (2003), citing Commonwealth v. Robinson, 399 Mass. 209, 217 (1987). “Unlike the objective ‘reasonable person’ standard common to most search and seizure questions, the test for whether consent is voluntary is totally subjective, focusing ‘on the particular individual, rather than on a hypothetical reasonable person.’ ” Joseph A. Grasso, Jr. & Christine M. McEvoy, Suppression Matters Under Massachusetts Law, §11-3 at li-li (2009-2010 ed.), quoting United States v. Lewis, 921 F.2d 1294, 1301 (D.C.Cir.1990).
Common factors considered in determining if consent was voluntarily given “include lack of knowledge of right to refuse; intoxication or influence of drugs; physical injury; no prior arrest record; the defendant’s mental or emotional state; the defendant’s age, education, and maturity level; whether the defendant was under arrest; whether the defendant was ‘strong-minded and intelligent’; whether the defendant was alone when consent was given. No one factor alone will be determinative.” Id. at 11-12, citing Commonwealth v. Harmond, 376 Mass. 557, 562 (1978). Claims of involuntary consent “should be carefully scrutinized.” Id., citing Harmond, 376 Mass. at 562.
1. The initial entry into 105 Bellingham
Officer Graham’s request to be admitted to 105 Bellingham to search for the defendant was not coercive. He introduced himself and his fellow officers to Ms. Jenks, explained their purpose for being at her home, and asked her permission to enter 105 Belling-ham to search for the defendant. The court credits Officer Graham’s statement that he used his standard approach to requesting entry into Ms. Jenks’s apartment. There is no evidence he threatened Ms. Jenks or attempted to obtain her consent through intimidation. Ms. Jenks was able to understand and communicate effectively with Officer Graham.
The defendant contends that the number of law enforcement officers present at 105 Bellingham created an atmosphere that was so coercive as to render Ms. Jenks’s consent involuntary. The court disagrees. “The presence of several uniformed officers” does not compel a finding of involuntary consent. Harmond, 376 Mass. at 561-62. See, e.g., United States v. Griffin, 530 F.2d 739, 741, 743 (7th Cir. 1976) (consent to search apartment given voluntarily notwithstanding the presence of “several Chicago police officers” surrounding the apartment); Commonwealth v. Caputo, 439 Mass. 153, 161 (2003) (arrival of four police officers at resident’s home did not render consent to enter involuntary). In this case, three plainclothes agents knocked on the front door of Ms. Jenks apartment. There is no evidence that Ms. Jenks was aware of the agents in the rear of the residence watching the backdoor.
Furthermore, contrary to the defendant’s suggestions, the officers were not required to apprise Ms. Jenks of her right to refuse to give her consent to their entry into 105 Bellingham. See Commonwealth v. Sanna, 424 Mass. 92, 98 & n.10 (“That the police did not advise” a resident “of his right to withhold consent to the police entry . . . does not vitiate the consent”). The record contains no evidence that Officer Graham’s introduction describing himself as “with the police” had any effect on Ms. Jenks’s decision to give consent, much less an effect that undermined the voluntary nature of that consent.
2. The search of the lockbox
The officers’ request to search the lockbox found in the defendant’s bedroom closet presents a much closer question, but the court finds that it too was not coerced.[1] When asked if he had a passport, the defendant directed the officers to the dresser in the bedroom. There, they found a roll of currency, but not the passport. One of the officers asked if the passport might be in the locked box found in the closet. The defendant said that he did not think it was there. At that point, the defendant had been arrested, and was handcuffed in his underwear while seven ICE officers were in his home.
These circumstances certainly suggest some coercive properties. See, e.g., Commonwealth v. Midi, 46 Mass.App.Ct. 591, 594-95 (1999) (“[W]ith Thomas surrounded by police who had just made one arrest, one might view skeptically whether Thomas’ acquiescence in further search was an act of free will”). Nevertheless, there is nothing to indicate that the defendant’s arrest and the presence of the ICE officers made his consent the product of “duress or coercion, express or implied.” See Commonwealth v. Rogers, 444 Mass. 234, 237 n.4 (2005).
The defendant was able to communicate effectively with the ICE officers. There is no evidence in the record that he was so upset as to be acting irrationally, and there is nothing in the record that suggests that the officers obtained the defendant’s consent by means of duress, coercion, or intimidation. In particular, there is nothing in the record that suggests that the officers pressured him to open the lock box or that he was *565 adamant in stating that the passport was not in it. Compare United States v. Jones, 523 F. 3d 31, 38 (1st Cir. 2008) (arrest of defendant in his hotel room by “ten to fifteen” law enforcement officers, with “guns drawn,” did not render his subsequent consent to the officers to search the room involuntary where “there was no indication” the defendant “was mistreated” by the officers); Commonwealth v. Gonzalez, 60 Mass.App.Ct. 903, 904 & n.5 (2003) (holding verbal consent given by woman after being placed under arrest was voluntaiy). See also Commonwealth v. Franco, 419 Mass. 635, 642 (1995) (“The fact that the defendant consented to the search while under arrest does not preclude a finding that the consent was voluntarily given”).
3. The police presence following the removal of the defendant
“It is a settled principle that the proper scope of a consensual search is no greater than the consent given.” Commonwealth v. Brown, 32 Mass.App.Ct. 649, 652 (1992), citing United States v. McBean, 861 F.2d 1570, 1573 (11th Cir. 1988). What “limitations on the consent are implied by the language and conduct of the consenting party is a question in the first instance for the judgment of the police officers to whom the consent is given. The ultimate question is whether, in light of all the circumstances, a man of reasonable caution would be warranted in the belief that some limitation was intended by the consent giver.” Commonwealth v. Catalupo, 380 Mass. 173, 178 (1980).
“[T]he scope of consent. . . may have reference to, and be limited by, the objects . . . for which consent to search is given. If consent is given to search for particular objects, police may not search areas that cannot be expected to hold the objects for which consent was given.” Grasso & McEvoy, Suppression Matters Under Massachusetts Law, §11-4 at 11-14. Here, Ms. Jenks consented to the officers’ entiy into 105 Bellingham to permit them to search for the defendant. That is the request that Officer Graham made of Ms. Jenks. Once the defendant was removed from 105 Bellingham and the officers had determined that there was no one else in the apartment, the officers had completed the task for which Ms. Jenks had given consent. There is no evidence that they asked either the defendant or Ms. Jenks for continued permission to remain in their home or to search for anything else. Cf., e.g., United States v. DiChiarinte, 445 F.2d 126, 130 (7th Cir. 1971) (police reading of defendant’s personal papers exceeded scope of consent given to search for the presence of narcotics); Commonwealth v. Thomas, 67 Mass.App.Ct. 738, 742 (2006) (consent to search for key to front door did not allow police to search through drawers in defendant’s bedroom nightstand).
The officers’ decision to remain after the defendant was removed meant that they were in 105 Bellingham unlawfully.[2] Contrast Franco, 419 Mass. at 640 (1995) (“When police officers lawfully enter a residence to execute an arrest warrant and observe suspected items of contraband in plain view, they are not required to immediately leave the premises once they have determined whether the subject of the arrest warrant is present”) (emphasis added). Unlike Franco, the officers observed no contraband in 105 Bellingham, and thus had no lawful reason to remain there once the defendant had been removed.
Moreover, even if the ICE officers had been lawfully present in 105 Bellingham, they did not have automatic authority to admit the state and local police officers. Cf. Commonwealth v. Neilson, 423 Mass. 75, 79 (1996) (“The defendant’s consent was given, not to police officials, but to the University and the latter cannot fragmentize, share, or delegate it... While the college officials were entitled to conduct a health and safety inspection, they clearly had no authority to consent to or join in a police search for evidence of a crime”) (alterations deleted). There is no evidence Ms. Jenks or the defendant gave consent for those officers to enter their home. Indeed, the record reveals only that additional officers were present in the apartment, some of them not even known to Officer Graham, when Officer Graham and the defendant returned.
4. The defendant’s consent to search the apartment
Once the defendant was returned to 105 Belling-ham at 11:00 A.M., he observed that the ICE officers, and several state and local police officers, were present inside. The defendant’s consent for the officers to search his apartment was rendered involuntary by the officers’ unlawful presence in his home.
“Consent to search obtained through exploitation of a prior illegality, particularly very close in time following the prior illegality, has not been regarded as freely given unless the taint of the illegality has been attenuated.” Commonwealth v. Allen, 54 Mass.App.Ct. 719, 721-22 (2002). “It is the burden of the Commonwealth to prove that the taint has been sufficiently attenuated to allow admission of the evidence derived from the prior illegality.” Id. at 722.
“Several factors guide [the] determination of whether a subsequent consensual search is sufficiently attenuated from a prior illegality: lapse in time, intervening circumstances, and disconnection between the prior illegality and the person giving consent to search.” Commonwealth v. Ocasio, 71 Mass.App.Ct. 304, 309 (2008). Here, there was an extremely close temporal nexus between the illegal conduct of the police and the defendant’s consent — indeed, “the police requested consent while improperly inside the home.” Commonwealth v. Yehudi Y., 56 Mass.App.Ct. 812, 817 (2002) (emphasis in original). The fact that there was no break in the nexus between the illegal entry and the request for consent leads [this court] to conclude that the Commonwealth has not met its *566 burden to establish that the . . . consent was sufficiently attenuated from the improper entry.” Id. at 818.[3] Indeed, viewed from the defendant’s perspective, there were no intervening circumstances between the illegal conduct by the police, i.e., the officers’ continued unlawful presence in the apartment, and the defendant’s decision to give consent to search. Contrast Ocasio, 71 Mass.App.Ct. at 310 (parly giving consent “informed . .. of her right to refuse”); Kipp, 57 Mass.App.Ct. at 634 (defendant Mirandized).
After assisting Officer Graham in arresting William, the defendant was returned to his apartment and found it full of additional officers. He had no reason to believe that anyone had consented to their admission into the apartment. Under these circumstances, it appears that he would have no reason to believe that they would have refrained from a search of his apartment, if he had not signed the consent form. In consequence, the court finds that the Commonwealth has not carried its burden of showing that the taint of the police’s presence in 105 Bellingham, in violation of the defendant’s rights under the Fourth Amendment and article 14, had been cured by the time the defendant was shown the consent to search form. Accordingly, all evidence seized after the defendant was first removed from 105 Bellingham will be suppressed. The defendant’s statements to the police following seizure of this evidence are subject to exclusion as fruit of the poisonous tree.
The court finds additional support for its conclusion that evidence seized and statements made after the defendant’s return to the apartment should be suppressed in the following supplementary observations.
The defendant’s statements to Lt. Callahan concerning the location of cocaine in his bathroom were obtained by exploitation of the unlawful search. See Commonwealth v. Damiano, 444 Mass. 444, 453-54 (2005) (statements deemed to be the product of exploitation of prior illegality when the police conduct “is sufficiently grave and the connection between the illegality and the making of the statements is sufficiently intimate”), and cases cited.
During the search, one of the officers told the defendant “if there was additional contraband in the house, [they] were going to locate it; if [the defendant] . . . led them to where it was concealed ... it might protect his girlfriend from any criminal prosecution or arrest that was possible." In response to the officer’s queiy, the defendant led the officers to the bathroom, from which they recovered cocaine and drug paraphernalia.
The defendant was responding to questions posed to him during an unlawful search. As the questioning officer himself put it, if there was additional contraband in the house, they were going to locate it. Based on those circumstances, it was eminently reasonable for the defendant to conclude that further exercise of his rights would be futile.
Additionally, the officers’ suggestion that the defendant’s cooperation would protect his girlfriend weighs against a finding of voluntariness. See Commonwealth v. Berg, 37 Mass.App.Ct. 200, 206 (1994) (concern for loved one may render confession involuntary).
Finally, and equally importantly, the defendant agreed to assist Officer Graham in his search for William after Officer Graham told the defendant that in return for his assistance, Officer Graham might look favorably on releasing him, subject to conditions, while the defendant awaited deportation. No one thereafter explained to the defendant that his consent to the search of his apartment by drug enforcement officers was not a continuing part of the assistance that Officer Graham had requested, and might result in his release pending deportation, but rather was part of an investigation into crimes with which the defendant was going to be charged.
ORDER
For the foregoing reasons, the defendant’s Motion to Suppress is ALLOWED to the extent it pertains to all cocaine, currency, drug paraphernalia, incriminating statements, and other evidence obtained after the defendant was initially removed from 105 Bellingham by Officer Graham. In all other respects, the Motion to Suppress is DENIED.

 There was no constitutional prerequisite for the officers’ request for the defendant’s consent to search the lockbox. “Asking for permission to search is akin to approaching an individual on the street and asking a question; no special predicate is required to do so.” Grasso & McEvoy, Suppression Matters Under Massachusetts Law, §11-3 at 11-9.

 That Ms. Jenks expanded the scope of her consent to search the apartment for others who might have been present is of no help to the Commonwealth. Officer Graham reported that such a search commenced soon after the officers gained entry to 105 Bellingham; there would have been no reason for the officers to have continued to search for others in the apartment for hours after the defendant was arrested and removed.

 In Yehudi Y., consent was deemed involuntary despite the consenting parties’ opportunity to consult with each other; evidence that the consenting parties knew of their right to refuse; and that the consenting parties were not in custody. Id. at 818 & n.10. These circumstances ordinarily suggest consent was voluntary; the temporal nexus between the illegal conduct of the police and the consent in Yehudi Y. overrode all of them. Id.
Here, none of those mitigating factors are present, and the temporal nexus between the police’s illegal entry and the defendant’s consent is just as strong. Contrast Kipp, 57 Mass.App.Ct. at 634 (consent deemed voluntary where “the defendant was given his Miranda warnings and he understood them, a conclusion bolstered by the defendant’s prior experience with the criminal justice system. That the defendant understood his rights is demonstrated by his initial refusal to consent . . . [TIhe defendant was motivated to consent by his knowledge that drugs would not be found at his apartment. ).