COMMONWEALTH vs. JOSE M. LOPEZ.

No. 07-P-1911.

Suffolk. November 17, 2008. - August 13, 2009.

Present: LENK, MEADE, & FECTEAU, JJ.

Further appellate review granted, 455 Mass. 1103 (2009).

*Firearms. Narcotic Drugs. Constitutional Law,* Search and seizure. *Search and Seizure,* Motel room, Consent. *Consent.*

A District Court judge erred in allowing the criminal defendant's motion to suppress evidence of a firearm and marijuana that were seized after a police officer entered a motel room (in which the defendant was present) to retrieve a discarded hypodermic needle, where the officer's entry into the room was not a search in the constitutional sense; where the officer reasonably relied on the consent of the woman who answered the motel room door to permit him entry, despite his not knowing who she was or her relationship to the owner of the motel room; where the marijuana was in plain view once the officer entered the room; and where the officer had articulable reasons to justify the sweep that resulted in the seizure of the firearm. [819-826] LENK, J., dissenting.

COMPLAINT received and sworn to in the Chelsea Division of the District Court Department on August 31, 2005.

A pretrial motion to suppress evidence was heard by *Diana L. Maldonado*, J.

An application for leave to prosecute an interlocutory appeal was allowed by *Francis X. Spina*, J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him to the Appeals Court.

*Kathleen Celio*, Assistant District Attorney, for the Commonwealth.

*Andrea Petersen* for the defendant.

FECTEAU, J. In this interlocutory appeal,[1] the Commonwealth challenges the allowance of the defendant's motion to suppress

---

[1]Leave to prosecute an interlocutory appeal was allowed by a single justice of the Supreme Judicial Court on March 21, 2007.

evidence in the District Court, where the defendant was charged with unlawful possession of a firearm, G. L. c. 269, § 10(*a*); possession of a firearm without an identification card, G. L. c. 269, § 10(*h*), and possession of marijuana, G. L. c. 94C, § 34. The Commonwealth contends that the judge erroneously allowed the defendant's motion on the basis that it was unreasonable for the officer to believe that the woman who opened the door to a motel room had actual or apparent authority to consent to his entry into the room.[2] For the reasons that follow, we conclude that the judge erred.

*Background.* The following are the relevant facts found by the judge, "supplemented by uncontroverted facts adduced at the hearing." *Commonwealth* v. *Torres*, 433 Mass. 669, 670 (2001). On August 30, 2005, at approximately 9:00 P.M., as part of their routine patrol, Officers Desimone and Chan stopped at the Ocean Lodge in Revere. During the visit, the motel manager, known to them as "Victor,"[3] asked the officers to retrieve a discarded hypodermic needle, a service the police regularly provided. As the officers were about to do so, they received a radio dispatch that requested they respond to an emergency call. The officers told Victor that they would return after they responded to the emergency call.

Later that night, around 10:00 P.M., the officers returned to the Ocean Lodge and went to the motel management office to locate Victor. When they did not find him there, the clerk at the desk told the officers that she thought Victor was in his room. The officers thought, based upon past experience, that Victor's room was room 138; the room was detached from the main building with its own entrance and was a room Victor usually occupied.[4]

---

[2]The defendant contends that the motion judge was correct in allowing his motion to suppress, relying on the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights. However, the brief does not develop the State constitutional arguments; "[t]hus, we base our views on Federal law only." *Commonwealth* v. *Waite*, 422 Mass. 792, 800 n.6 (1996). See *Commonwealth* v. *D'Onofrio*, 396 Mass. 711, 713 n.4 (1986); *Commonwealth* v. *Woods*, 419 Mass. 366, 372 n.10 (1995).

[3]"Victor's" real name was Dipkamur. For the six or seven months that he worked at the motel, he referred to himself as "Victor," and other officers knew him by that name.

[4]Officer Desimone testified that it was "common knowledge where [Victor]

Officer Desimone went to room 138, with a container for hazardous objects, while Officer Chan remained in the unmarked cruiser. The officers did not call for assistance because of the routine nature of the transaction. Officer Desimone knocked on the door, announced himself as police, and stated, "Hello, Victor." An unknown woman opened the door and Officer Desimone asked, "Hello, is Victor here?" The woman looked at the officer kind of "funny — like a deer in the headlights type of look" — and stated, "I don't know." Desimone showed her the needle holder in his right hand and told her, "He asked me to pick up a needle." He then asked her, "Can I come in?" to which the woman answered, "Yeah, sure." Although she appeared to understand the officer's questions, Desimone testified that she "appeared to be nervous" and "kind of stunned," as if she were "maybe under the influence of drugs."

The motion judge found also that "[t]he Commonwealth offered no evidence that the officers believed 'Victor' to be married, dating, or living with any women. They did not know who this woman was or what her relationship to Victor or to the room was. She was simply the person who opened the door."

The woman shut the door after the officer entered. Once inside the room, Officer Desimone realized that the layout for room 138 was different from that of the other rooms in the motel, which usually consisted of only a single room; here, there were two small, adjoining rooms. Upon his entry, immediately after the door closed, and as he stood in the first room with the woman, Officer Desimone noticed to his right, through an open doorway leading to the second room, three men sitting on a bed next to a pile of a green, leafy substance, which appeared to him to be marijuana. The men appeared nervous and started to move their hands around when they saw the officer.

Officer Desimone testified[5] that "the last thing [he] wanted to do was make any arrests or bring any type of attention to [the

stayed." While the officer had not ever visited Victor in room 138, he visited the motel every night to check the log of occupants at the motel, and Victor often told him "this is where I'm staying," referring to room 138. The officers had never responded to calls in that room before.

[5]While the judge did not make a specific finding as to the credibility of the officer's testimony, the defendant did not dispute any of it. Further, the judge used facts from the officer's testimony as a basis for her opinion, from which

motel]" because he did not want to "jeopardize" a major ongoing, unrelated drug investigation at that motel. Officer Desimone told the men, "Guys relax. It's just marijuana. I'm not here to arrest anyone for marijuana." He then shook the needle canister he was still holding and told them he was here to pick up a needle. Knowing that he was the only officer in a room with four other people, he said, "Guys, just all I'm asking you is to just let me see your hands. I don't want you guys to shoot me." The men then looked away from the officer to their right, towards the other end of the room. Officer Desimone could not see what they were looking at because of where he was standing, but he soon heard "some shuffling or scuffling" coming from the room. Still holding the needle holder in his right hand, Officer Desimone stuck his head through the door and heard a "thump" coming from a small metal trash barrel at the far corner of the room. The defendant was standing nervously next to the metal can. Officer Desimone then radioed Officer Chan for assistance.

After Officer Chan and another officer arrived, all the men were relocated to the front room where the woman was still standing. Officer Desimone found a loaded .38 revolver in the trash basket, and the defendant, responding to Officer Desimone's question, admitted that he did not have a firearm identification card for the gun. After retrieving the gun, Officer Desimone had a conversation with his superior, Lieutenant Ruggiero, who had just arrived on the scene. Desimone told Ruggiero that he did not want to make an arrest because of the ongoing drug investigation. He recommended putting the gun into safekeeping or doing something that would not involve making an arrest because he "[did not] want to create any type of havoc." Lieutenant Ruggiero responded "absolutely not," and insisted on having the defendant arrested. Officer Desimone complied and arrested him.

At 11:00 or 11:30 P.M. that night, Officer Desimone spoke with Victor at the police station. Desimone had wanted to talk

---

such a finding is implied. *Commonwealth* v. *Crowe*, 21 Mass. App. Ct. 456, 459 n.4, cert. denied sub nom. *Pirrotta* v. *Massachusetts*, 479 U.S. 838 (1986) (court concluded that motion judge, who had adopted victim's facts in findings without specifically determining credibility, had credited her testimony in those respects).

to Victor to clarify the occupancy of room 138, since he had thought Victor occupied that room. Victor explained that he had not resided in the room for about a week, as he had rented the room to the defendant and the defendant's father and cousins. The defendant had shown Victor the weapon. Victor told the officer that although he had asked the officer to come to pick up a needle, he really meant to inform the officers of that gun.

The judge allowed the motion to suppress because she found that Officer Desimone unreasonably relied on the woman's "clear, unambiguous and voluntary" consent. In her findings she stated, "[T]he Commonwealth [did not] establish[] that this woman possessed the actual or apparent authority to consent to the entry." She found that the officer did not have information suggesting that anyone else was staying in the room with Victor, nor did he have any information about whether Victor was married or dating. She also found that the officers knew nothing about the woman or what, if any, relationship she had with Victor. The motion judge concluded that "there was nothing . . . to suggest a reasonable belief that this woman (who as far as the police knew was simply the person who opened the door) possessed the authority or apparent authority to consent to their entry."

*Discussion.* An appellate court accepts the findings of the motion judge in the absence of clear error and defers to his or her assessment of the credibility and weight of testimony. See, e.g., *Commonwealth* v. *Gentile*, 437 Mass. 569, 573 (2002); *Commonwealth* v. *Clark*, 65 Mass. App. Ct. 39, 43 (2005), and cases cited. However, we must conduct an independent review of the motion judge's ultimate findings and conclusions of law to assure the correctness of the application of constitutional standards to the facts found. *Commonwealth* v. *Scott*, 440 Mass. 642, 646 (2004). *Commonwealth* v. *Wilson*, 441 Mass. 390, 393 (2004).

The judge allowed the defendant's motion to suppress evidence of the gun and drugs because she concluded that the officer unreasonably relied on the consent from the woman who answered the door. This case turns on the issue of apparent authority to consent to an entry by police into a motel room. Fundamental to that question is whether a police encounter of constitutional dimension occurred and, if so, at what moment constitutional import first attached.

"Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's 'castle' with the honest intent of asking questions of the occupant thereof — whether the questioner be a pollster, a salesman, or an officer of the law." *Davis* v. *United States*, 327 F.2d 301, 303-304 (9th Cir. 1964) (defendant's eight year old daughter could consent to police entry, though not search).[6] See *Manni* v. *United States*, 391 F.2d 922, 923 (1st Cir.), cert. denied, 393 U.S. 873 (1968) (affirming lawfulness of officers' entry into front room of defendant's home where "the purpose of the entry was to engage in the conversation the agents had been seeking" and defendant knew of such purpose and consented to entry); *Akron* v. *Harris*, 93 Ohio App. 3d 378, 382 (1994) (third party may consent to entry but not to search); *State* v. *Chapman*, 97 Ohio App. 3d 687, 690 (1994) ("that where the intent of the officers was not to conduct a search, but only to question a resident, the consent of a third party to enter the house should not be held to the same standard as the consent of a third party to a warrantless search of the house"); *Commonwealth* v. *Netting*, 315 Pa. Super. 236, 240-241 (1983) (evidence not suppressed where guest admitted police to apartment, police were not attempting to secure permission to search apartment but rather were responding to complaint to determine occupants' well-being, and search was conducted with defendant's consent). See also *United States* v. *Kim*, 27 F.3d 947, 949-950, 954 (3d Cir. 1994), cert. denied, 513

[6]*Davis* v. *United States*, *supra* at 304, discusses the time of police approach as a factor in reasonableness. In *Davis*, the officers knocked on the defendant's door in the middle of the afternoon and asked if they could talk to the defendant. The court held that their presence at the door and request to enter and speak with the defendant was not a search and that the defendant's eight year old daughter, who answered the door, could give consent to the officers' entry. *Id.* at 302-305. See *State* v. *Thompson*, 578 N.W.2d 734, 740 (Minn. 1998) ("it was reasonable for the officers to believe that the young man who answered the door had the apparent authority to give them limited consent to enter the apartment for the purpose of talking with the occupants therein"). Here, although Officer Desimone approached at approximately 10:00 P.M., the time does not diminish the fact that the officer's intention was to collect a dirty needle. An hour earlier he had spoken to Victor and had told Victor that he would return after responding to an emergency call.

U.S. 1110 (1995) (no search or seizure when police questioned defendant at door of sleeping compartment in train). Contrast *United States* v. *Jerez*, 108 F.3d 684, 689-693 (7th Cir. 1997) (officer's continuous knocking on hotel room door around 11:00 P.M. for over three minutes and asking defendant to open door to talk constituted an unconstitutional seizure).[7]

Here, the officer's entry into the room was not a search in the constitutional sense; the officer's purpose in entering the room was neither to search nor arrest, but merely to retrieve the needle that Victor had asked him to pick up.[8] The officer did not approach the room intending to search for evidence of criminal activity. See *Robbins* v. *MacKenzie*, 364 F.2d 45, 49 (1st Cir.), cert. denied, 385 U.S. 913 (1966) (reasonable for police to rely on householder's consent to entry when officer disclosed purpose and did not intend to conduct search but only to speak with defendant; officer also did not attempt to engage in search upon entry in home). See also *Davis* v. *United States*, 327 F.2d at 303 (officers went to defendant's home for sole purpose of talking to him and not to search). Contrast *Commonwealth* v. *Painten*, 368 F.2d 142, 143-144 (1st Cir. 1966), cert. dismissed, 389 U.S. 560 (1968) (search was likely intended where police sought entry without stating their purpose and where police knew of crime and suspected defendants to be involved). The officer approached the room reasonably thinking Victor was there, and there was no evidence he knew otherwise. The record before us also shows that the officer wanted to avoid any encounters that would lead to arrests because he did not want to interfere with an unrelated, ongoing investigation of the motel. Further, when he saw the

---

[7]The dissent sees no need to rely upon extra-jurisdictional case law; however, no cases from this jurisdiction or from the United States Court of Appeals for the First Circuit have been cited or located by us, nor does the dissent rely upon any, that involve a noninvestigatory, nonemergency purpose such as that which brought the police to the defendant's door.

[8]Under a totality of the circumstances analysis, each case necessarily turns on its facts. *Commonwealth* v. *Rogers*, 444 Mass. 234, 242 (2005). See *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 233 (1973) (ascertaining whether consent is voluntary involves "careful sifting of the unique facts and circumstances of each case"). In our analysis of the totality of the circumstances the fact that the police were at the motel to collect a needle, not to conduct a search, supports the propriety of the woman's consent. Here, one of the facts is unquestionably the reason why the police were at the motel.

three occupants sitting on the bed with marijuana, the officer specifically told them that he was not there to arrest them for marijuana. Finally, even after finding the loaded gun, the officer tried to encourage his lieutenant not to arrest the defendant so as not to interfere with the unrelated investigation: his lieutenant insisted on the arrest.

Viewed objectively, these circumstances do not reasonably indicate that Officer Desimone intended to conduct a search, thus obviating any need to second-guess the woman's consent to enter. The officer, who had no ulterior motive, reasonably relied on her consent after telling her who he was and his purpose. *Robbins* v. *MacKenzie*, 364 F.2d at 49 (when officer does not intend to search, officer need not question householder's consent). Police may rely on a third party's consent even when they reasonably, though mistakenly, believe she has the authority to consent. *Illinois* v. *Rodriguez*, 497 U.S. 177, 186 (1990). See *United States* v. *Rosario*, 962 F.2d 733, 737 (7th Cir. 1992) (hotel visitor acted at all times as if he were gatekeeper to room). "The critical facts, however, are not the actual relationship between the consenter and [the occupant-defendant], but how that relationship appears to the officer who asked for consent." *United States* v. *Jenkins*, 92 F.3d 430, 436 (6th Cir. 1996), cert. denied, 520 U.S. 1170 (1997). The totality of the circumstances would not have put a reasonable officer, who was at the room to pick up a dirty needle, on notice that the woman did not have authority to consent to entry into the room. See *id.* at 436-437; *Commonwealth* v. *Maloney*, 399 Mass. 785, 786-788 (1987).

Given the limited purpose of his visit, Officer Desimone acted reasonably in entering without making further inquiry after the woman opened the door, regardless of the fact that he did not know who she was or her relationship with Victor. Here, while the motion judge made findings that the woman "clear[ly], unambiguous[ly] and voluntar[ily] consent[ed]" to the officer's entry,[9] she concluded that the police officer's reliance on the woman's consent was not reasonable, given that he did not know

---

[9]The defendant makes the alternative argument, in the event we determine the officer's reliance on the woman's grant of permission to enter was reasonable, that the judge erred in her ruling that the woman voluntarily granted permission, contending, rather, that she acquiesced to his authority. We disagree. The consent must be "unfettered by coercion, express or implied, . . . [which

who the woman was and what relationship, if any, she had with Victor. While we agree with the judge's finding that the officer did not know who the woman was, we disagree with her conclusion that it was unreasonable for the officer to think she had authority to consent to his entry. Officer Desimone asked her if Victor was there. She said she did not know. The officer then informed her that Victor had asked him to pick up a needle. She said, "Oh, okay." He asked if he could enter, to which she said, "Yeah, sure." From this exchange, notwithstanding his lack of knowledge as to whether Victor was married or had a roommate, the police officer had a reasonable belief that the woman had the authority to consent to the officer's entry into the room. Whether the belief was ultimately erroneous is of no import. *Illinois* v. *Rodriguez,* 497 U.S. at 185-186. *Georgia* v. *Randolph,* 547 U.S. 103, 109 (2006).

The United States Supreme Court noted in *Illinois* v. *Rodriguez,* 497 U.S. at 188, that "law enforcement officers may [not] always accept a person's invitation to enter premises. Even when the invitation is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry."[10] However, here, since the officer expressed no intention to conduct a search (nor can such an intent be reasonably inferred), the attending circumstances were not such that the officer should doubt the woman's authority to allow his entry.

In this case, Officer Desimone approached the room that he thought Victor was in, and although he did not know the woman who answered the door or her relationship with Victor, she

is] something more than mere 'acquiescence to a claim of lawful authority.' " *Commonwealth* v. *Harmond,* 376 Mass. 557, 561 (1978), quoting from *Commonwealth* v. *Walker,* 370 Mass. 548, 555, cert. denied, 429 U.S. 943 (1976). Here, the officer's activities were anything but coercive. The record amply supports the judge's finding that the woman's consent was voluntary.

[10]*Illinois* v. *Rodriguez,* 497 U.S. at 179-182, 189, presents a different set of facts from here that should prompt officers to be more skeptical of a person's apparent authority to consent to entry. In *Illinois* v. *Rodriguez,* the officers went to the defendant's apartment to arrest him. They did not have an arrest or search warrant and entered the apartment accompanying a woman who referred to his residence as "our apartment" and who had a key to the front door. The officer in the case before us had no intention to arrest or search upon entry into the hotel room.

never acted as though she could not permit him to enter. See *Sterling-Ward* v. *Tujaka*, 414 F. Supp. 2d 727, 735 (E.D. Mich. 2006). Indeed, she was not a child, compare *Davis* v. *United States*, 327 F.2d at 502, "[s]he did not hesitate in opening the door, nor did she tell [the officer] she had to check with [the defendant] or anyone else to see if she could let [the officer] in." *Sterling-Ward* v. *Tujaka, supra.* Similarly, here, an objective officer in Desimone's shoes could reasonably conclude that the woman had authority to allow him to enter, as she asked neither permission nor guidance from anyone in the room before allowing the officer to enter. See *United States* v. *Rosario*, 962 F.2d at 737-738 (police reasonably relied on consenter's apparent authority to permit entry to hotel room when they knocked on door, identified themselves, stated reason they were there, and asked permission to enter room, which consenter immediately provided); *Commonwealth* v. *Hughes*, 575 Pa. 447, 461 (2003) (teenage girls sitting on porch outside of house had apparent authority to allow entry when they did not hesitate to give consent and opened door for officers to enter). Here, the woman who allowed the officer to enter answered the door at night, around 10:00 P.M. See *United States* v. *Jenkins*, 92 F.3d at 437 (reasonable officer could usually assume that someone who comes to door after police knock has authority to consent to entry). The woman gave no indication that she could not give him permission to enter. The defendant, present at the time, did not object to the officer's entry. See *Commonwealth* v. *Ocasio*, 71 Mass. App. Ct. 304, 307-309, cert. denied, 129 S. Ct. 314 (2008). See also *United States* v. *Rosario, supra.* See and compare *Georgia* v. *Randolph*, 547 U.S. at 107-108, 120-123. In *Commonwealth* v. *Ocasio, supra*, the police reasonably relied on a cotenant's actual and apparent authority to consent to search the premises even though the defendant was present during the search and never signified assent, nor did he voice any objection or protest to the search. On the record before us, neither the defendant nor any occupant of the second room protested or objected to the woman's consent to the officer's entry. Therefore, the officer had no reason to doubt that the woman had authority to give consent. It was thus reasonable for the officer to assume that the woman had authority to allow him to enter to get a needle.

As suggested, the woman gave her consent to Officer Desi-

mone merely to enter and collect a needle, not to search. Compare *Commonwealth* v. *Noonan,* 48 Mass. App. Ct. 356, 362 (1999) (consenter "can surely be taken to have given as much consent as she had power to give"). Indeed, after she agreed to the officer's entry, she closed the door behind him. Once inside the motel room, Desimone had a clear view of the second bedroom, three occupants sitting on the bed, and a green, leafy substance around them. The officer could lawfully seize the marijuana he saw in plain view on the bed.

Under the plain view doctrine an object may be seized without a warrant when "police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent," and if they come across the evidence inadvertently. *Commonwealth* v. *D'Amour,* 428 Mass. 725, 730-731 (1999). As discussed above, Officer Desimone was lawfully in the motel room when he saw three men sitting on a bed in a second bedroom surrounded by a green, leafy pile. The officer immediately identified the green substance on the bed as marijuana, the incriminating character of which was obvious. Further, the officer inadvertently discovered the contraband, as there is no evidence on the record that the officer anticipated finding any drugs in the room. See *Commonwealth* v. *Balicki,* 436 Mass. 1, 8-10 (2002) (upholding inadvertence requirement in art. 14 plain view analysis). Once the officer observed contraband in plain view, he could lawfully seize the evidence, and exigency justified and authorized his securing of the room. *Commonwealth* v. *D'Amour,* 428 Mass. at 730-731 ("In the case of contraband and fruits and instrumentalities of crime, the nexus to criminal activity is obvious"). See *Commonwealth* v. *Martino,* 412 Mass. 267, 275-276 (1992); *Commonwealth* v. *Gentile,* 437 Mass. 569, 575 (2002).

The officer's seizure of the gun was also proper. Although the woman's consent was limited to entry, based on articulable facts present here the officer could "perform a limited search of the [motel] room to determine that no one else was present who could have either destroyed the evidence . . . or present[ed] a danger to the officer[] . . . ." *Commonwealth* v. *Streeter,* 71 Mass. App. Ct. 430, 439-440 (2008). See *Commonwealth* v. *Ferrara,* 376 Mass. 502, 505 (1978) (if stop of motor vehicle justified, officers could take precautions for own protection). "The

risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter. . . . [U]nlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf.' An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings." *Commonwealth* v. *DeJesus*, 70 Mass. App. Ct. 114, 119 (2007), quoting from *Maryland* v. *Buie*, 494 U.S. 325, 333 (1990). The Commonwealth must show "articulable facts warranting a belief that there were one or more individuals in the dwelling posing a danger to the police or others present." *Commonwealth* v. *DeJesus*, *supra* at 116.

Here, Officer Desimone had "articulable facts" to justify the sweep. He saw, in plain view, illegal drugs lying on a bed, the three men sitting on the bed looked extremely nervous, and, when he entered, they started moving their hands around. The men complied with the officer's request to show their hands and not shoot him, but kept glancing to their right at a part of the room the officer could not see. Finally, the officer heard some movement — shuffling or scuffling — from the room, obviously not coming from the three men on the bed. The officer had reason to believe that someone else was in the room and an "objective concern for [his] safety." *Commonwealth* v. *DeJesus*, *supra* at 120. See *Commonwealth* v. *Torres*, 433 Mass. 669, 675 (2001). As the officer looked into the room, the defendant dropped something into a trash bin that made a thump and that he reasonably could have suspected to be a gun (indeed, as it turned out, it was). As the gun was in plain view and was in reach of the defendant, the officer properly seized the gun.

Consequently, the judge's order suppressing the marijuana and gun seized from the defendant's motel room must be reversed.

> *Order allowing motion to*
> *suppress reversed.*

LENK, J. (dissenting). In the course of performing a public service — collecting a dirty needle at the request of a motel manager — Officer Desimone entered the defendant's motel

room and happened upon drugs and a gun that he had no prior interest in finding. It is not difficult to understand why, in trying to retrieve the dirty needle as requested, Officer Desimone went to what he thought was the motel manager's room, nor is it difficult to appreciate how one thing may have led to another thereafter. We nonetheless must not lose sight of the fact that he was acting in his capacity as a police officer when, without a search warrant, he entered what our case law has long recognized as a home. A police officer can reasonably be expected to know that warrantless entries into a home are the exception, not the rule, and that he or she must accordingly tread carefully before crossing the threshold. Unlike the majority, I see the warrantless entry here as being in violation of constitutional protections.

Under State and Federal constitutional law, warrantless police entries into homes are impermissible save where the Commonwealth can demonstrate that a challenged entry is justified under one of the narrowly circumscribed exceptions to the search warrant requirement. Because there was no urgency of any kind here, the Commonwealth correctly does not attempt to justify this entry on the basis of the emergency aid or community caretaking exceptions to the warrant requirement. Nor can the Commonwealth quite rely upon the consent exception, conceding that the unknown woman who opened the door did not have the actual authority to consent to Officer Desimone's entry. The Commonwealth accordingly relies instead on the doctrine of apparent authority, itself in essence an exception to the consent exception.

In assessing whether the Commonwealth has met its burden under this exception, we are to consider whether it was objectively reasonable for Officer Desimone to have thought that the woman who came to the door actually had the authority to consent to his entry. In concluding that the Commonwealth met its burden, the majority places dispositive weight on the officer's "limited purpose" in being there, and almost no weight on what the officer knew about the woman and her relationship to the room. In doing so, the majority overlooks the fact that the latter and not the former is where the emphasis belongs under our case law, which the majority largely ignores in its reliance on non-Massachusetts authority. It also overlooks that, to satisfy the "reasonableness" requirement of the Fourth Amendment to the United States Constitution, the information on which an officer

relies in evaluating whether an individual has authority to consent must be "seemingly reliable." *Illinois* v. *Rodriguez*, 497 U.S. 177, 184 (1990). Because the officer knew almost nothing about the woman and her relationship to the room, and what he did know undercut any reasonable belief that she possessed the authority to consent, I conclude that the Commonwealth did not meet its burden under the apparent authority to consent exception to the search warrant requirement. The officer's warrantless entry into the motel room was thus constitutionally impermissible. For these reasons, I respectfully dissent.

1. *Constitutional significance of police entry.* In a recent decision under art. 14 of the Massachusetts Declaration of Rights, the Supreme Judicial Court reiterated the well-settled principle that "[t]he right of police officers to enter into a home, for whatever purpose, represents a serious governmental intrusion into one's privacy. It was just this sort of intrusion that the Fourth Amendment [to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights] [were] designed to circumscribe by the general requirement of a judicial determination of probable cause." *Commonwealth* v. *Peters*, 453 Mass. 818, 819 (2009), quoting from *Commonwealth* v. *Forde*, 367 Mass. 798, 805 (1975), and *Commonwealth* v. *DeJesus*, 439 Mass. 616, 619 (2003).

The full protection of the Fourth Amendment and art. 14 extends to the legitimate privacy expectations of motel room occupants. *Stoner* v. *California*, 376 U.S. 483, 489-490 (1964) (guests in hotel rooms enjoy protections against unconstitutional searches and seizures "[n]o less than a tenant of a house, or the occupant of a room in a boarding house"). *Commonwealth* v. *Martinez*, 47 Mass. App. Ct. 839, 842 (1999) ("[t]hat the inhabitants of the motel room had a reasonable expectation of privacy in it is not in dispute"), citing *Commonwealth* v. *Hamilton*, 24 Mass. App. Ct. 290, 292 n.5 (1987) ("[o]f course, a motel room is an area protected by the Fourth Amendment"). As a residence, albeit a temporary one, the defendant's motel room must be viewed as a home for purposes of this analysis.

The sanctity of the home is of central concern in Fourth Amendment and art. 14 jurisprudence, and warrantless police entry into a home is in and of itself a matter of constitutional moment.

*Commonwealth* v. *Peters, supra.* Such warrantless entries into the home are presumptively illegal. *Commonwealth* v. *Sondrini,* 48 Mass. App. Ct. 704, 707 (2000). Our case law does not recognize a lesser degree of justification for warrantless entry of a home when the purpose of the entry is not to conduct a search. "The reason for the rule against warrantless entry 'is to protect the physical integrity of the home from warrantless police intrusion.' " *Commonwealth* v. *Rogers,* 444 Mass. 234, 237 (2005), quoting from *Commonwealth* v. *Sanna,* 424 Mass. 92, 96 n.9 (1997).

There are circumstances that may justify warrantless entry into a home, but these exceptions have been described as "few," "exceptional," and "jealously and carefully drawn." *Commonwealth* v. *DiGeronimo,* 38 Mass. App. Ct. 714, 721 (1995), citing *Katz* v. *United States,* 389 U.S. 347, 357 (1967), and *G.M. Leasing Corp.* v. *United States,* 429 U.S. 338, 352-353, 358 (1977), and quoting from *Jones* v. *United States,* 357 U.S. 493, 499 (1958). See *Commonwealth* v. *Knowles,* 451 Mass. 91, 94 (2008) (exceptions "for police officers performing their community caretaking function and for emergencies" have been "carefully carved out"[1]). "Warrantless entries into the home are prohibited by the Fourth Amendment . . . and art. 14 . . . absent either probable cause and exigent circumstances or consent." *Commonwealth* v. *Rogers,* 444 Mass. at 236. It is the government's burden to establish that the warrantless entry at issue is justified under one of the recognized exceptions. "[I]t is the Commonwealth's obligation to establish its theory of entry and prove lawful entry based on that theory." *Id.* at 245.

2. *Consent exception to search warrant requirement.* Here, the Commonwealth proceeded on the theory that the officer's

---

[1]It is unclear whether the community caretaking exception applies to warrantless entries of homes. See *Commonwealth* v. *Sondrini,* 48 Mass. App. Ct. at 706-708 & n.3 (Justice Kaplan, writing for the court, noted, "For purposes of the present case we assume for the benefit of the Commonwealth that the caretaking, so-called, can extend to entrance into a residence, although there is some opinion that its field of operation is the situations of diminished expectations of privacy, such as intrusion into automobiles"). In any event, with both the emergency aid and the community caretaking exceptions, when the officer decides to carry out such functions, there must be an "objective basis . . . for believing that the defendant's safety and well-being or that of the public was in immediate jeopardy." *Commonwealth* v. *Knowles,* 451 Mass. at 95.

warrantless entry into the defendant's motel room was based on consent given by the third party who opened the defendant's motel room door. The Commonwealth concedes that the unidentified woman[2] did not have actual authority to consent to the entry. The Commonwealth instead maintains that the entry was justified by the doctrine of apparent authority. To withstand the prohibition of the Fourth Amendment against unreasonable searches and seizures, when police officers act on the basis of the apparent authority of an individual to consent to an entry, the "determination of consent to enter must 'be judged against an objective standard: would the facts available to the officer at the moment . . . "warrant a man of reasonable caution in the belief" ' that the consenting party had authority over the premises?" *Illinois* v. *Rodriguez*, 497 U.S. 177, 188 (1990), quoting from *Terry* v. *Ohio*, 392 U.S. 1, 21-22 (1968). *Commonwealth* v. *Rogers*, 444 Mass. at 249 (Greaney, J., dissenting).

When determining whether a third party has actual authority to consent to entry of the defendant's home, the focus is "on the relationship between the consenter and the property searched, not the relationship between the consenter and the defendant." *Commonwealth* v. *Noonan*, 48 Mass. App. Ct. 356, 362 (1999), quoting from *United States* v. *McAlpine*, 919 F.2d 1461, 1464 (10th Cir. 1990).[3] A third party with actual authority to consent must possess "common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States* v. *Matlock*, 415 U.S. 164, 171 (1974). The doctrine of apparent authority comes to the fore when the third-party consenter

---

[2]The only witness for the Commonwealth at the motion hearing was Officer Desimone. While the defendant, his cousins, and his father, to whom Victor had rented the room, had all been arrested, the unidentified woman was not. There is no identifying information of record concerning her.

[3]The majority, *ante* at 825, quotes the observation in *Commonwealth* v. *Noonan, supra,* that the consenting party "can surely be taken to have given as much consent as she had power to give," implying that the *Noonan* court thereby drew a difference between authority to consent to mere entry as opposed to authority to consent to a search. In fact, no such distinction is drawn in *Noonan*. There, the consenter had authority to "give consent to a search," and in fact she did so. Hence, the phrase "as much consent as she had power to give," *ibid.*, meant the ultimate power a cotenant can have: power to consent to search. There is not even a suggestion in *Noonan* that a lower standard might be considered for evaluating a limited type of consent power dependent on the purpose of entry.

does not in fact have actual authority, but where it was objectively reasonable at the time for the police to have believed she did. The focus of the inquiry remains unchanged, and what matters is what the officer knew about the relationship between the third-party consenter and the premises or effects sought to be inspected. The police officer need not have been right about the facts concerning the third party's authority over the premises — he or she may, after all, have been provided facially reasonable but nonetheless incorrect information. *Illinois* v. *Rodriguez*, 497 U.S. at 186. Both United States and Massachusetts law, however, require that the officer be reasonable in thinking that the facts known to him or her at the time of entry, if correct, would add up to the consenter having such authority.

In determining what might be sufficient to establish the existence of apparent authority to consent, we look to Massachusetts precedent.[4] Most recently, in *Commonwealth* v. *Porter P.*, 73 Mass. App. Ct. 85 (2008), further appellate review granted, 453 Mass. 1101 (2009), we upheld the warrantless entry of a resident's room in a homeless shelter by the police, who accompanied the shelter's director at her request. *Id.* at 86. Although we concluded that the shelter director in fact had actual authority to consent to police entry, see *id.* at 87-89, 92-93, we also determined that "the police — based upon their independent review of the manual [which informed residents that room searches were shelter policy], [the director's] status as the director of the shelter, and their discussions with her about prior searches — could reasonably have concluded . . . that [the shelter director] had the common authority to authorize entry into [the] room . . . ." *Id.* at 95.

In *Commonwealth* v. *Rogers*, 444 Mass. at 247, the majority did not reach the questions of actual or apparent authority to consent because they determined that the third party's consent had not been shown to have been freely and voluntarily given. Justice Greaney, writing in dissent, did reach these issues and reasoned that the facts sufficiently established both actual and apparent

---

[4]To date, no warrantless police entry has been upheld in Massachusetts solely on the basis of apparent authority to consent; rather, the entries upheld to date have involved apparent authority as an alternative basis to actual authority, which also existed.

authority. He noted that Rose, the woman who answered the door to the defendant's apartment between 4:40 and 5:00 A.M., was known to the officer who sought entry; she was someone he had seen previously in the defendant's company and at the apartment. *Id.* at 247-248. "[H]er response to his question as to the defendant's whereabouts was spontaneous and immediate, and she gave no outward indication that she was uncertain as to whether she should, or should not, admit the officers." *Id.* at 249. The officer knew that Rose "was not just a casual guest of the defendant," and the officer "had every reason to believe that Rose was aiding the defendant in selling cocaine from that apartment." *Id.* at 248. Given this, Justice Greaney wrote, it was reasonable for the officer "to assume that Rose was part of the defendant's operation and could authorize him to enter the apartment to speak with the defendant." *Id.* at 249.

In *Commonwealth* v. *Maloney*, 399 Mass. 785, 787-788 (1987), the live-in boyfriend of the homeowner had both actual and apparent authority to consent to a police officer's entry into their home in order to remove a trespasser and arson suspect. The boyfriend was a lawful occupant and answered the door in the presence of his girlfriend, a woman the police knew to be the homeowner and who lodged no objection to their entry. See *Commonwealth* v. *Allen*, 54 Mass. App. Ct. 719, 721 (2002) (police officers may conduct warrantless search of home "when authorized to do so by any competent person who reasonably appears to exercise common authority over the place to be searched" and whose consent is freely given).

The dearth of information known to Officer Desimone about the woman from whom he sought entry to the motel room and her relationship to that room stands in stark contrast to the foregoing cases. Officer Desimone testified that he had been to the motel earlier that day to deal with a prostitution problem in one of the rooms. He knew that the motel was also rife with drug problems, that a major drug investigation by the State police was in the works, and that he was frequently called to the motel on official police business. He went in uniform around 10:00 P.M. to room 138 looking for Victor, the motel manager, in order to retrieve a dirty needle as Victor had earlier requested. It is unclear whether Officer Desimone expected to find the dirty needle in room 138 or to be directed by Victor to a different

room. The officer had not been able to take the needle earlier because he was called away from the motel to deal with an emergency elsewhere. The officer had never been to room 138 before but knew from looking daily at the motel guest register (a practice, however, that had ended three months prior to the incident) that Victor had been known to stay in room 138. He knocked on the door, saying, "Hello, Victor." A woman whom he had never seen before opened the door, and he said, "Hello, is Victor here?" "And she kind of looked at me funny — like a deer in the headlights type of look, and she said, 'I don't know.' And that struck me as kind of weird, you know? She said, 'I don't know.' I said, 'Oh . . . .' I showed her . . . the needle holder . . . . I said, 'He asked me to pick up a needle,' and she said, 'Oh, okay.' I said, 'Can I come in?' And she said . . . like 'Yeah sure.' " "She appeared to be nervous. She looked kind of stunned, and I wasn't sure if maybe she was maybe under the influence of drugs or what it was, but she looked a little . . . staring and just kind of shocked look."

It is plain from the foregoing that the officer had no information about the woman or her relationship to the premises. Until he stepped inside, the officer did not know that room 138, unlike the other motel rooms he had been in, had two rooms; before entering, then, he understandably thought it "weird" that the woman did not know whether Victor was in the same motel room that she was in. The unidentified woman could have been anyone — a prostitute paying a visit, a motel employee, a wife or girlfriend living with Victor, a visiting sister or friend, someone buying drugs — the officer did not have a clue. And he did not ask. The majority sees no reason for him to have done so, discerning no overt indications that the woman lacked authority to consent — she was an adult who opened the door without hesitation at 10:00 P.M., and she did not say that she needed to consult with anyone nor did she go back into the room to do so.[5] However, as was said in *Commonwealth* v. *Rogers*, 444 Mass. at 240, albeit in

[5]To the extent that the majority relies on *Commonwealth* v. *Ocasio*, 71 Mass. App. Ct. 304, cert. denied, 129 S. Ct. 314 (2008), for the proposition that, because the defendant was present in the other room of room 138 but did not object to the police entry, "the officer had no reason to doubt that the woman had authority to give consent," *ante* at 824, the majority overlooks key factual differences in *Ocasio*. As a cotenant, of course, the mother in *Ocasio* had

a slightly different context: "We simply cannot . . . infer so much from so little." Not only did the situation seem "weird" to the officer, but also from the woman's responses it did not appear that she either knew where Victor was or would have any requisite information as to where the needle was, yet the officer made no further inquiries. Our case law requires more than this to establish the exception.

The majority's analysis misconceives the relevant inquiry to be made in ascertaining whether the third party had apparent authority to consent and, in the process, relieves the Commonwealth of its burden to establish that the warrantless entry was based on valid consent. As in *Commonwealth* v. *Porter P.*, *supra*; *Commonwealth* v. *Rogers*, *supra*; and *Commonwealth* v. *Maloney*, *supra*, the Commonwealth needs to prove that there were facts affirmatively known to the officer that would permit him reasonably to believe that the person giving consent had authority over the premises.[6] It is not enough to say that the officer was not aware of any facts showing she had no such authority. Justice Scalia, writing for the United States Supreme Court in *Illinois* v. *Rodriguez*, 497 U.S. at 188, explained: "[W]hat we hold today does not suggest that law enforcement officers may always accept a person's invitation to enter premises. Even when the invitation is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry."

The surrounding circumstances here, including the absence of any information whatsoever about the woman or her relationship to the premises, her confused and stunned demeanor, as well as her lack of knowledge regarding Victor's whereabouts, would cause a reasonable person of caution to question whether she was

---

actual and apparent authority to consent to the police entry, and the defendant did not object or protest even though the two searches of his apartment occurred while he was standing at the door to the apartment. *Id.* at 305-306. Here, unlike both *Ocasio*, *supra*, and *Rogers*, *supra* at 249, the officer had already made the crucial "apparent authority" decision, entered the motel room, and seen the contraband by the time the defendant could protest the officer's entry.

[6]On the facts present here, the officer's decision to request entry can hardly be said to be based on "seemingly reliable . . . information," *Illinois* v. *Rodriguez*, 397 U.S. at 184, and, as such, fails to meet the "reasonableness" requirement of the Fourth Amendment. *Id.* at 184-189.

a lawful occupant of the motel room with common authority over the premises. A reasonable person would not act upon the information without further inquiry such as: Who are you? Are you staying here? Whose room is this? "[U]nder a sound application of the apparent authority rule the police must be required to make reasonable inquiries when they find themselves in ambiguous circumstances. . . . [S]ometimes the facts known by the police cry out for further inquiry, and when this is the case it is not reasonable for the police to proceed on the theory that 'ignorance is bliss.' " 4 LaFave, Searches and Seizures § 8.3(g), at 177-180 (4th ed. 2004).

3. *The officer's "limited purpose" entry.* In concluding that the Commonwealth has satisfied the apparent authority exception to the warrant requirement, the majority places inordinate weight on the officer's purpose in seeking to enter the motel room and disregards the officer's lack of information about the woman who opened the door. The majority posits that because the purpose of the entry was not to conduct a search for evidence of criminal activity but to perform a public service, the police intrusion into the home was of minimal, if any, constitutional significance. It relies on a handful of out-of-State cases and Federal cases primarily from the Courts of Appeals for the Third, Sixth, Seventh, and Ninth Circuits[7] for this proposition, as well for the distinction it draws between the consent to enter a home and the consent necessary to search for evidence of criminal activity, with the former requiring less stringent scrutiny of the consenter than the latter. Viewing Officer Desimone's own noninvestigative intentions as part of the totality of the circumstances known to him at the time, the majority is satisfied that the officer had no need to second guess the consent that the woman gave him to enter the room for that limited purpose.[8]

There are, of course, any number of good faith noninvestigative reasons that might cause a police officer to seek entry to a

---

[7]It is to be noted that the two cases from the United States Court of Appeals for the First Circuit cited by the majority as support for the relevance of the officer's purpose in seeking entry do not deal with apparent authority, but rather with the issue of consent.

[8]If the officer's limited purpose in seeking entry is pertinent, it is because he communicated that intention to the woman answering the door. The information may have reassured her and thereby prompted her to allow him entry but it otherwise has no bearing on her apparent authority to consent.

home at a reasonable hour for a "limited purpose," such as in response to complaints about a barking dog or loud music or even to ask for a charitable contribution. On the majority's expansive view of apparent authority, the police would presumably have no need to second-guess the consent given them to enter in those circumstances either, so long as whoever comes to the door, whether or not known to them, does nothing to suggest they are without authority to consent. That it might well be a nonresident such as a partygoer or a visiting neighbor who opens the door would not matter on this analysis. In my view, this is a worrisome prospect, the proverbial camel's nose under the tent that will erode the search warrant requirement.

I see no basis, moreover, for relying on non-Massachusetts authority, particularly when such decisions fly in the face of our established case law.[9] Warrantless police entry into a home that

---

[9]Even if the out-of-State and Federal decisional law upon which the majority relies would support its analysis as a matter of Federal constitutional law, such case law does not in any event construe art. 14 of the Massachusetts Declaration of Rights, which has long been recognized as offering greater protections than the Fourth Amendment to the United States Constitution in the search and seizure context. See, e.g., *Selectmen of Framingham* v. *Municipal Court of the City of Boston*, 373 Mass. 783, 786-788 (1977) ("as matter of Massachusetts law, even though it may not be required by the Federal Constitution," evidence seized in an illegal warrantless search of police officer's home was inadmissible in administrative hearing); *Commonwealth* v. *Ortiz*, 376 Mass. 349, 358 (1978) (when analyzing "constitutional prohibitions against unreasonable search and seizures," court acknowledged that "our State Constitution may afford greater protections to a person in certain circumstances than those required by Federal decisions interpreting the Fourth Amendment"); *Commonwealth* v. *Sheppard*, 387 Mass. 488, 508 n.22 (1982) (Wilkins, J.), rev'd on other grounds, 468 U.S. 981 (1984) (noting "the possibility of affording more substantive protection to criminal defendants under art. 14 of the Declaration of Rights than under the Fourth Amendment as applied through the Fourteenth Amendment"); *Commonwealth* v. *Shields*, 402 Mass. 162, 176 (1988) (Liacos, J., dissenting) ("We have not hesitated to grant to our citizens greater protection under art. 14, and we should do so here," in context of roadblock seizures); *Commonwealth* v. *Nattoo*, 452 Mass. 826, 830 n.3 (2009) ("in some instances, [art. 14] provides greater protection in the area of searches and seizures than does the Fourth Amendment"); *Commonwealth* v. *Peters*, 453 Mass. at 826 n.6 (because warrantless search of home impermissible under art. 14, court did not need to determine "whether the same conclusion would be required by the Fourth Amendment"); *Commonwealth* v. *DiGeronimo*, 38 Mass. App. Ct. at 721 n.8 ("a warrantless intrusion that falls afoul of the Fourth Amendment will certainly violate the presumptively more stringent requirements of art. [14]").

Our courts have frequently recognized the broader protections afforded by

cannot be justified by a recognized and well-circumscribed excep-
tion to the warrant requirement is an unreasonable intrusion in
violation of the Fourth Amendment and art. 14. Officer Desimone
may have been providing a salutary public service to the motel in
safely disposing of dirty needles, but there was absolutely noth-
ing pressing or urgent about it that necessitated entry into the
defendant's motel room.[10] That his intentions were good and his
actions understandable are not pertinent considerations in deter-
mining whether his warrantless entry was justified by the woman's
apparent authority to consent, yet that is all we have here. The
officer got consent from someone whom he had no reason to
think could consent, other than the fact that she opened the door.
Other facts known to him undercut the objective reasonableness
of believing *the unidentified woman could consent*: she is not
Victor, she does not know what the officer is talking about, she

---

art. 14 while in the course of construing the Fourth Amendment. Under our
courts' analyses of the Fourth Amendment as it bears on warrantless police
intrusions of the home, however, the protections deemed afforded by the
Fourth Amendment and by art. 14 are sufficiently congruent so as generally
not to have occasioned separate analysis under art. 14. Compare *Commonwealth
v. Peters, supra.* Although acknowledging that the defendant preserved an art.
14 challenge, the majority suggests that the issue need not be considered
because the defendant did not separately argue the point. I disagree with the
conclusion that the defendant's brief did not adequately argue the issue. The
brief referred to art. 14 several times throughout and rested its arguments on
both the Fourth Amendment and art. 14. Two recent decisions, moreover,
counter the view taken by the majority that the absence of separate briefing on
the State constitutional issue by the defendant presents such an impediment to
our consideration of the issue. See *Commonwealth* v. *Peters,* 453 Mass. at
819, 823-826 & n.6, and *Commonwealth* v. *Means,* 454 Mass. 81, 82 n.1, &
88 n.12 (2009).

I also note that ours would not be the first State to limit the reach of the ap-
parent authority exception to the warrant requirement based on State
constitutional grounds. See *State* v. *Lopez,* 78 Haw. 433, 446 (1995) ("an
invasion of privacy is no less of an 'invasion' if the governmental officials are
'reasonable' in their mistaken belief that the third party possesses the authority
to consent"); *State* v. *McLees,* 994 P.2d 683 (Mont. 2000) (Supreme Court of
Montana holding same).

[10]Our case law already takes into account situations where the police purpose
is not to search for evidence of criminal activity, such as emergency situations
requiring nonconsensual warrantless police entry into homes. See *Com-
monwealth* v. *Snell,* 428 Mass. 766, 774-775, cert. denied, 527 U.S. 1010
(1999); *Commonwealth* v. *Bates,* 28 Mass. App. Ct. 217, 219-220 (1990);
*Commonwealth* v. *DiGeronimo,* 38 Mass. App. Ct. at 722-725; *Commonwealth*
v. *Allen,* 54 Mass. App. Ct. at 721.

does not know where Victor is, and she seems high. That leaves just the officer's own intent to enter for a noninvestigative purpose which, in my view, is simply not enough to satisfy the apparent authority exception to the warrant requirement.

Moreover, this is not one of those situations where one asks, "What else was the officer to do?" *Commonwealth* v. *Davis*, 63 Mass. App. Ct. 88, 91 (2005). The officer had clear alternatives: he could have asked the woman more questions to see if she had common authority over the room and then have acted accordingly, or he could simply have left, knowing that he was likely to be back at the motel in the near future and could get the needle from Victor then. What the officer could not do under our law is what he did. The motion judge correctly granted the defendant's motion to suppress.[11]

---

[11]The defendant argues in the alternative that the motion judge made no findings of fact in support of her ruling that the unidentified woman's consent to enter was voluntarily given, and that given the woman's nervous, stunned, and possibly drug-induced demeanor, the officer's comments to her about Victor and the dirty needle could arguably have been understood by her to mean that the police already had permission to enter and she acquiesced to the uniformed officer's claim of authority. See *Commonwealth* v. *Rogers*, 444 Mass. at 238 ("In meeting its burden of establishing voluntary consent to enter, the Commonwealth must provide us with more than an ambiguous set of facts that leaves us guessing about the meaning of this interaction and, ultimately, the occupant's words or actions"). Because I would affirm the allowance of the motion to suppress on the basis that the Commonwealth failed to establish the woman's apparent authority to consent, I do not address this contention further.